

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-1-2001

# AT&T Comm of NJ Inc v. Verizon NJ Inc

Precedential or Non-Precedential:

Docket 00-2000

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"AT&T Comm of NJ Inc v. Verizon NJ Inc" (2001). *2001 Decisions.* Paper 255.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/255

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 1, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2000

AT&T COMMUNICATIONS OF NEW JERSEY, INC.;

STATE OF NEW JERSEY DIVISION OF THE
RATEPAYER ADVOCATE,

       Plaintiff-Intervenor
       in district court

v.

*VERIZON NEW JERSEY, INC.;
THE NEW JERSEY BOARD OF PUBLIC UTILITIES,
an agency; HERBERT H. TATE; CARMEN J. ARMENTI,
in their capacities as Commissioners of the
Board of Public Utilities

State of New Jersey Division of the Ratepayer Advocate,

       Appellant

*(Amended-See Clerk's order dated December 19, 2000)

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. Civ. No.: 97-cv-05762)
District Court Judge: The Honorable Katherine S. Hayden

Argued June 21, 2001

Before: ROTH, AMBRO and FUENTES, Circuit Judge s

(Opinion Filed: November 1, 2001)

Blossom A. Peretz, Esq. (argued)
Ratepayer Advocate
Division of the Ratepayer Advocate
31 Clinton Street, 11th Floor
P.O. Box 46005
Newark, New Jersey 07101

 Attorney for Appellant
New Jersey Division of the
Ratepayer Advocate

Frederic K. Becker, Esq. (argued)
Wilentz, Goldman & Spitzer
A Professional Corporation
90 Woodbridge Center Drive
P.O. Box 10
Woodbridge, New Jersey 07095-0958

 Attorney for Appellee
Verizon New Jersey, Inc.

Eugene P. Provost, Deputy Attorney
 General (argued)
John J. Farmer, Jr.
Attorney General of New Jersey
R.J. Hughes Justice Complex
P.O. Box 112
Trenton, New Jersey 08625

 Attorney for Appellees
New Jersey Board of Public
Utilities, Herbert H. Tate and
Carmen J. Armenti in their
capacities as Commissioners of the
Board of Public Utilities

OPINION OF THE COURT

FUENTES, Circuit Judge:

This case arises out of a special proceeding conducted by the New Jersey Board of Public Utilities ("Board") to determine rates that would be generally available to telecommunications carriers seeking to negotiate or

arbitrate interconnection agreements under the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) ("Telecommunications Act" or"1996 Act"). The Board decided to substitute these newly determined rates for the previously arbitrated rates in an interconnection agreement between AT&T Communications of New Jersey ("AT&T") and Bell-Atlantic New Jersey ("Bell Atlantic") (now known as Verizon New Jersey, Inc. ("Verizon")). AT&T brought suit challenging the Board's substitution. Thereafter, the District Court entered an order affirming the Board's decision to substitute rates but reversing the Board on its methodology. On appeal, the New Jersey Division of the Ratepayer Advocate ("the Advocate"), which had been allowed to intervene in the proceedings, contends that the District Court erred in holding that the Board had the legal and statutory authority to substitute its own rates for those set by arbitration. We will not reach this issue, however, because we conclude that the Advocate lacks constitutional standing to bring this appeal.

I.

A.

There are three main parties to this appeal. The appellant, the Advocate, is an independent agency of the State of New Jersey that is authorized to appear as a party on behalf of ratepayers in all utility matters that are before the Board. N.J.S.A. S 13:1D-1. On the opposing side, the Board is an independent agency within the Executive Branch of the New Jersey State government, N.J.S.A. S 48:2-1, that has "general supervision and regulation of and jurisdiction and control over all public utilities," N.J.S.A. S 48:2-13(a). The Board is a state public utility commission. Federal law defines such entities as those which, under state law, have regulatory jurisdiction over intrastate operations of telecommunications carriers. 47 U.S.C. S 153(41). The other main appellee is Verizon, a telecommunications carrier previously known as Bell Atlantic.

To understand the somewhat complex procedural history of this case, we will begin with the statutory framework that

3

Congress established to deregulate local telephone markets. On February 8, 1996, Congress enacted the Telecommunications Act of 1996. See Pub. L. No. 104-104, 110 Stat. 56 (1996). Section 101 of the Telecommunications Act inserted sections 251 to 261 into Title 47 of the United States Code. 110 Stat. at 61-80.

For much of the history of telecommunications, federal law has carved out a regulatory role for state commissions such as the Board. Prior to 1996, state commissions pervasively regulated local telephone service and granted exclusive franchises to incumbent local exchange carriers ("ILECs"), such as Bell Atlantic in New Jersey, to provide service in particular areas.1See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 FCC Rcd. 15,499, at P I.A.[hereinafter Local Competition Order], amended on other grounds by 11 FCC Rcd. 22,301 (1996).

The Telecommunications Act ended these legal barriers to competition by providing that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. S 253(a). With respect to local telephone service, Congress sought to create a transition mechanism from the pre-1996 ILEC area monopolies to a system of "facilities-based competition," i.e., competition based on network facilities other than those owned by the ILECs. See H.R. Conf. Rep. No. 104-458, at 148 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124, 160. Network facilities are the physical infrastructure through which telecommunications carriers deliver their phone services.

Congress recognized that removing the legal protections

_____

1. A local exchange carrier, or LEC, is "any person that is engaged in the provision of telephone exchange service or exchange access." 47 U.S.C. S 153(26). In laymen's terms, a LEC is a provider of local telephone service, and an incumbent local exchange carrier, or ILEC, is the LEC that, at the time of the adoption of the 1996 Act, provided exclusive telephone exchange service in a particular area. In 1996, Bell Atlantic was one of three ILECs in New Jersey.

traditionally afforded the ILECs would not, by itself, accomplish "facilities-based competition." In particular, Congress believed that the ILECs were gatekeepers of telephone consumers in their respective areas, in part, because of their control over local network facilities. See H.R. Conf. Rep. No. 104-204, at 74, reprinted in 1996 U.S.C.C.A.N. 10, 39-40. Congress further believed that new telecommunications carriers (a.k.a. "CLECs") 2 entering local telephone markets could not effectively compete with the ILECs if the new entrants were required to duplicate the ILECs' networks before providing local service. See Local Competition Order, at P I.C.10.

Because of these concerns, Congress imposed certain affirmative duties on ILECs to advance the transition toward facilities-based competition. Thus, among other things, ILECs must: (1) permit requesting telecommunications carriers to interconnect their facilities with the ILEC's network, 47 U.S.C. S 251(c)(2); (2) lease certain elements of their local network to carriers"on an unbundled basis," that is, allow the use of individual pieces of the network, id. S 251(c)(3); (3) sell carriers, at wholesale rates, any telecommunications services that the ILEC provides to its own customers at retail rates, in order to allow those carriers to resell the services, id. S 251(c)(4); and (4) allow carriers to construct facilities necessary for interconnection on the ILEC's premises, id.S 251(c)(6).

The Telecommunications Act sets forth a procedure for arriving at the prices that an ILEC may charge telecommunications carriers for interconnection to the ILEC's local network ("interconnection rates"), as well as for the other services detailed above. Id. S 252. Thus, the 1996 Act invites carriers to "negotiate" binding interconnection agreements with the ILEC. Id. S 252(a)(1). The 1996 Act allows parties to interconnection negotiations to petition the designated State Commission to mediate or to arbitrate any unresolved issues. Id. SS 252(a)(2), (b). Furthermore, State Commissions have certain powers with respect to arbitrated

_____

2. A competitive local exchange carrier, or CLEC, is a LEC that is a new entrant into the local telephone service market. AT&T is a CLEC in New Jersey.

5

agreements, such as the power to accept or reject agreements. See generally id. S 252.

B.

In New Jersey, the enactment of the Telecommunications Act in February 1996 led to the commencement of several proceedings. In December 1995, in anticipation of the passage of the Telecommunications Act, the Board began an investigation of the appropriate terms for local telephone competition in New Jersey. On June 19, 1996, after the enactment of the Telecommunications Act, the Board instituted a proceeding to establish the terms and conditions under which the local exchange market in New Jersey should be opened to competition (the "Generic Proceeding"). Thereafter, the Board stated that it would review interconnection agreements reached through arbitration, mediation, or negotiation in conformity with 47 U.S.C. SS 251 and 252. The Board also stated that the Generic Proceeding would set rates, terms, and conditions that would be generally available for parties to adopt freely in negotiating and arbitrating interconnection agreements.

After the Generic Proceeding was underway, a number of telecommunications carriers sought to avail themselves of the provisions of the Telecommunications Act by negotiating or arbitrating interconnection agreements with ILECs. One of these carriers was AT&T, which, on March 1, 1996, asked Bell Atlantic to enter into an interconnection agreement pursuant to 47 U.S.C. S 252(a). Following negotiations with Bell Atlantic, AT&T petitioned the Board on July 15, 1996 to arbitrate several unresolved issues. The Board allowed the arbitration ("AT&T/Bell Atlantic arbitration") to be conducted by outside experts.

On August 7, 1996, the Board noted the existence of ongoing negotiations and arbitrations between carriers and ILECs to set interconnection rates, but nevertheless decided to continue with the Generic Proceeding, stating that "the information developed in [the Generic Proceeding] may well be relevant in assisting the Board to avoid disparate or inconsistent decisions with respect to the issues in[the] arbitrations." (App. at 38sa). A short while later, on August

6

15, 1996, the Board rejected the Advocate's request to participate in the arbitrations, reasoning that the arbitrations were two-party affairs and that the Advocate would have the opportunity to comment in the Generic Proceeding before the Board ruled on individual agreements resulting from the pending negotiations and arbitrations.

The Board invited numerous parties to participate in the Generic Proceeding. Testimony began on November 4, 1996, and lasted for twenty days. The Advocate and representatives of 11 segments of the telecommunications industry attended the hearings. Fifteen parties submitted briefs and four different cost studies were presented. At the conclusion, the Board determined a number of rates and conditions for interconnection and other services under the Telecommunications Act (the "generic rates").

Four days after the beginning of testimony in the Generic Proceeding, the AT&T/Bell Atlantic arbitration concluded with the arbitrator's decision on November 8, 1996. The arbitrator found that AT&T's cost analysis, a computer-based model called the Hatfield Model Version 2.2 ("Hatfield Model"), properly calculated the economic costs of interconnection. Using a modified version of the Hatfield model, the arbitrator established rates that would last for the term of the AT&T/Bell Atlantic agreement.

The arbitrator rejected Bell Atlantic's argument that the arbitrated rates should have only interim status pending the Board's ongoing action to establish the generic rates and terms. The AT&T/Bell Atlantic agreement was unique in that, while all other negotiated and arbitrated agreements between telecommunications carriers and Bell Atlantic had used rates that would remain effective only until the conclusion of the Generic Proceeding, the AT&T/Bell Atlantic agreement incorporated arbitrated rates that would last for the duration of the agreement without regard to the Generic Proceeding.

Following the arbitrator's decision, Bell Atlantic petitioned the Board to reverse the arbitrator. On July 17, 1997, at a public meeting, the Board ruled that the higher generic rates would supercede the arbitrated rates in the AT&T/Bell Atlantic interconnection agreement. On

September 9, 1997, the Board ordered AT&T to submit a fully executed agreement reflecting the Board's decision to use the generic rates. Under protest, AT&T complied. At a public meeting on October 8, 1997, the Board approved the AT&T/Bell Atlantic agreement incorporating the generic rates.

On December 2, 1997, the Board issued a written order memorializing the decisions that it had rendered at its previous public meetings. In the memorandum, the Board explained what it considered to be the flaws of the AT&T/Bell Atlantic arbitration, specifically with regard to the Hatfield Model. The Board wrote that the information before the arbitrator was neither as extensive nor as accurate as that before the Board during the Generic Proceeding. Furthermore, the Board expressed concern that "different arbitrators, looking essentially at the same facts, may arrive at inconsistent decisions, and that the generic proceeding could be of assistance in ensuring consistency in the setting of rates . . . with [Bell Atlantic] between and among the competitive LECs seeking such interconnection." (App. at 129a). The Board stated that of "great importance is the fact that this generic proceeding has allowed the Board to establish rates, terms and condition[s] for interconnection with [Bell Atlantic] . . . which are consistent statewide." (App. at 147a). In this respect, the Board noted that the separate arbitrations of AT&T and MCI with Bell Atlantic had yielded different results, even though the information considered was materially the same. Moreover, the Board noted, the AT&T/Bell Atlantic agreement was the only agreement that did not establish interim rates pending the Generic Proceeding. At the end of the memorandum, the Board provided a summation of its decision, in which it found that it was in the public interest to substitute the generic rates for the arbitrated rates in the AT&T/Bell Atlantic Interconnection agreement.

On November 24, 1997, AT&T filed a complaint in the District Court seeking review of, among other things, the Board's decision to replace the arbitrated rates with the generic rates. On February 2, 1998, the District Court entered an order permitting the Advocate to intervene, aligned as a plaintiff. The Advocate subsequently adopted AT&T's pleadings.

8

Following briefing and oral argument, the District Court issued an opinion on June 6, 2000, "affirming the Board's decision to substitute generic rates for arbitrated rates as a proper exercise of authority under the [Telecommunications] Act." (App. at 13a-16a). The District Court also held, however, that the specific generic rates for interconnection established by the Board were the result of "arbitrary and capricious" decision-making. Thus, the District Court reversed the Board's generic rate determinations and remanded the case to the Board for further proceedings. The Advocate filed a notice of appeal from that portion of the District Court's decision which affirmed the Board's action of substituting the generic rates for the arbitrated rates. AT&T is not a party to this appeal.

The District Court had jurisdiction over this case under 47 U.S.C. S 252(e)(6), which provides that any party objecting to a final agreement approved by a State Commission may seek judicial review in a federal district court. We have jurisdiction over the Advocate's appeal from the District Court's affirmance of the Board's decision under 28 U.S.C. S 1291.

II.

On appeal, the Advocate argues that the District Court erred in holding that the Telecommunications Act authorized the Board to substitute generic rates for the arbitrated rates in the AT&T/Bell Atlantic interconnection agreement. Initially, the appellees respond by arguing that the Advocate lacks standing to bring this appeal because the Advocate has not been aggrieved by the District Court's disposition, and because this Court's resolution of the issues raised in this appeal would afford the Advocate no actual affirmative relief.

Because standing is a fundamental jurisdictional question, challenges to standing must be addressed before reaching the merits of an appeal. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998). We have plenary review over questions of standing. Gen. Instrument Corp. of

9

Del. v. Nu-Tek Elecs. & Mfg., Inc., 197 F.3d 83, 86 (3d Cir. 1999).3

A.

Before delving into the doctrinal specifics of standing, we must first resolve a dispute between the parties as to the proper characterization of the Board's substitution of rates, as that dispute will, in part, determine the outcome of the standing issue. Throughout its briefs, the Advocate argues that the Board adopted a blanket policy that generic rates will supercede arbitrated rates in every instance and that the Board applied this policy to the AT&T/Bell Atlantic interconnection agreement. By contrast, the appellees view the Board's action to substitute the generic rates for the arbitrated rates in the AT&T/Bell Atlantic agreement as a fact-specific decision which was motivated by the peculiar deficiencies of the AT&T/Bell Atlantic arbitration. We believe that the latter view is more congruent with the record.

To begin, the Board's December 2, 1997, memorandum (the Board's only written document addressing rate substitution) is, by its terms, a fact-specific decision to substitute rates only into the agreement between AT&T and Bell Atlantic. Indeed, as we mentioned before, the end of the memorandum provides a summary that expressly notes the peculiar circumstances of the AT&T/Bell Atlantic arbitration and makes a finding only as to that arbitration:

> In summary, because the generic proceeding produced a complete factual and legal record which has permitted the Board to thoroughly evaluate all the issues related to the introduction of local exchange competition through interconnection, purchase of unbundled network elements and resale, because it was appropriate in the arbitrations to set interim rates which would be modified upon issuance of the Board's determinations in this proceeding, because the

_____

3. Because we ultimately dismiss the Advocate's appeal for lack of standing, we need not address the standard under 47 U.S.C. S 252(e)(6) for reviewing the merits of a State Commission's determination.

10

arbitrator in the AT&T/[Bell Atlantic] arbitration did not have a complete cost study record upon which to rely, because the Board in the instant proceeding has found significant flaws with the Hatfield model thus convincing the Board that the Hatfield model cannot alone form the basis of just and reasonable rates for interconnection and unbundled network elements, because of the uncertain legal landscape upon which the parties, arbitrators and the Board have had to rely, in light of all the considerations discussed herein, and pursuant to the Board's inherent . . . authority, the Board FINDS that it is in the public interest and in accordance with law to apply the generic rates, terms and conditions set forth in this Order to the interconnection agreement to be entered between AT&T and [Bell Atlantic] to the extent that those rates, terms and conditions have not been successfully negotiated by AT&T and [Bell Atlantic].

(App. at 155–56) (emphasis added). The "SUMMARY CONCLUSION AND ORDER" attached to the December 2, 1997 memorandum is limited in a similar fashion:

The following is a summary of Board directives contained herein for the convenience of the reader. Details are contained in the text of this Decision and Order.

 . . . .

4) The Board ORDERS that this 60/40 weighting factor is to be used for developing the cost of all elements for which Hatfield 2.2.2 model results and [Bell Atlantic] model results exists, utilizing the appropriate inputs as discussed herein. [This sets generic rates.]

5) The Board ORDERS that for those elements for which only one cost study result exists [i.e. the AT&T/Bell Atlantic agreement rates], that result is to be used utilizing the appropriate inputs discussed herein.
[This substitutes generic rates for arbitrated rates.]

(App. at 156).

11

The narrow focus of the December 2, 1997 memorandum is reflected in the actual effect of the Board's decision. At the conclusion of the Generic Proceeding, there were only two categories of rates (apart from the generic rates) in existence in New Jersey: (1) those contained in approved or pending agreements, which were effective only until rates were determined in the Generic Proceeding, and (2) the arbitrated rates in the AT&T/Bell Atlantic agreement, which, because of the arbitrator's decision, were permanent rates. Because the first category of rates was already, through consent, scheduled to give way to the generic rates, the Board's substitution of rates only affected the arbitrated rates in the AT&T/Bell Atlantic interconnection agreement.

Another important factor in characterizing the Board's action is its current position that its action, culminating in the December 2, 1997 memorandum, constituted a specific and one-time event. Specifically, the Board states in its briefs that it did not enact a general policy, and that "the Generic Order [i.e., the December 2, 1997 memorandum] does not preclude the prospective of negotiations or arbitrations" to arrive at rates different, and possibly more favorable, than the generic rates.

We apply de novo review to a state agency's legal interpretation of the 1996 Act. See MCI Telecomm Corp v. Verizon Pennsylvania, Inc., ___ F.3d ___ (3d Cir. 2001) [typescript at 43]. Such a legal interpretation would include the board's determination of the scope of its authority to alter rates determined by the parties to an interconnection agreement. Under this standard of review and with consideration of the clear language of the December 2, 1997, memorandum and of the Summary Conclusion and Order, we find that the Board's current position on the limited nature of its rate substitution action is reasonable. Thus, we construe the Board's action as substituting specific rates into only the AT&T/Bell Atlantic arbitration, rather than as a generally applicable policy.

B.

With this understanding of the Board's action, we now address the appellees' challenge to the Advocate's standing

12

on appeal. That challenge focuses on the constitutional requirements stemming from Article III, Section 2 of the United States Constitution. To demonstrate Article III standing, a plaintiff bears the burden of establishing three elements:

> First, the plaintiff must have suffered an injury in fact --an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result[of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations and internal quotations and footnote omitted); see also Pitt News v. Fisher, 215 F.3d 354, 359 (3d Cir. 2000) (observing that the three elements of Article III standing are injury-in-fact, causation, and redressability), cert. denied, 121 S. Ct. 857 (2001). We conclude that the Advocate can demonstrate neither injury-in-fact nor redressability.

As to injury-in-fact, the Advocate observes that New Jersey law expressly authorizes it to appear as a party on behalf of ratepayers in all utility matters before the Board. See N.J.S.A. S 13:1D-1. Relying on this statutory directive, the Advocate claims that there are five types of direct, palpable injury that it seeks to remedy. According to the Advocate: (1) retail prices charged by CLECs are higher because the Board's generic rates are higher than the arbitrated rates; (2) ratepayers will lose the benefits of continuous cost-cutting; (3) the Board's substitution of generic rates for arbitrated rates eliminates product and price diversity; (4) the Board's action will deter competitive entry into the local exchange market by raising entry costs and discouraging differentiation; and (5) the Advocate will suffer an increased workload arising from the foregoing four harms. We conclude that none of these alleged injuries

13

meets the rigorous constitutional standards for an injury–in–fact.

First, because the District Court ordered the Board to redetermine its generic rates, it is unclear whether ratepayers will actually pay more or whether they will pay an improperly high rate. In the future, ratepayers will not be harmed by the rates set unless the Board improperly sets generic rates on remand. Cf. Envtl. Action v. FERC, 996 F.2d 401, 406–07 (D.C. Cir. 1993) (finding injury–in–fact where a regulator sets rates higher than those sought by consumers). As to the latter four injuries, each of them depends upon continuing harms arising from the Board repeatedly substituting improperly high generic rates in the future. However, because the Board made a case specific decision to substitute rates into the AT&T/Bell Atlantic interconnection agreement and because those rates will be redetermined, we are constrained to reject these four alleged injuries. Therefore, having concluded that there is no injury–in–fact, we hold that the Advocate lacks standing to bring this appeal.

Even if we were to determine that the Advocate suffered an injury–in–fact, we would still conclude that the Advocate lacks standing because its alleged injury is not redressable. There is no appropriate remedy that we can grant to the Advocate. Here, the District Court remanded the case to the Board for a redetermination of the rates in the Generic Proceeding. Under these circumstances, it is difficult to conceive of a remedy that would benefit the Advocate. That is, if we were to adopt the Advocate's position and reverse the District Court with respect to the Board's authority to substitute rates, that reversal would not change the result of the District Court's decision to remand the case for a redetermination. See Armotek Indus., Inc. v. Employers Ins. of Wausau, 952 F.2d 756, 759 n.3 (3d Cir. 1991) ("[A] party may appeal only if aggrieved by the district court's judgment. . . . [A] non-aggrieved party with no personal stake in the appeal may [not maintain the appeal]."). Thus, we conclude that the Advocate is asking us to render a purely theoretical opinion on the legal propriety of rate substitution under the Telecommunications Act. This is not a remedy we can provide, however, for we are prohibited

14

from issuing advisory opinions. See Roe v. Operation Rescue, 919 F.2d 857, 861 (3d Cir. 1990).

The Advocate argues that a possible remedy is for this Court to extend the terms of the AT&T/Bell Atlantic interconnection agreement beyond July 31, 2000, its original termination date, and to impose arbitrated rates during that extended term. We deny this request. Before the District Court, both AT&T and Bell Atlantic explicitly rejected any use of the arbitrated rates after July 31, 2000. Moreover, the parties are now arbitrating a new interconnection agreement. Under these circumstances, we think that the Advocate's requested relief is neither available nor desired by the parties to the interconnection agreement. Thus, all told, we conclude that the Advocate's alleged injuries are not redressable and that therefore the Advocate lacks standing.

Because the Advocate lacks standing to bring this appeal, we express no opinion on the arguments the Advocate raises concerning the Board's authority under the Telecommunications Act to substitute the generic rates for the arbitrated rates in the AT&T/Bell Atlantic interconnection agreement.

III.

For these reasons, we will dismiss the appeal.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

15