# United States Court of Appeals
# For the First Circuit

No. 04-1711

GLOBAL NAPS, INC.,

Plaintiff, Appellant,

v.

VERIZON NEW ENGLAND, INC.; MASSACHUSETTS
DEPARTMENT OF TELECOMMUNICATIONS AND ENERGY;
PAUL B. VASINGTON, in his capacity as Commissioner;
JAMES CONNELLY, in his capacity as Commissioner;
W. ROBERT KEATING, in his capacity as Commissioner;
DIEDRE K. MANNING, in her capacity as Commissioner; and
EUGENE J. SULLIVAN, in his capacity as Commissioner,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before
Lynch, Lipez, and Howard, Circuit Judges.

William J. Rooney, Jr., with whom Jeffrey Melick was on brief,
for appellant.
Scott H. Angstreich, with whom Bruce P. Beausejour, Keefe B.
Clemons, Sean A. Lev, Mary Ann McGrail, and Kellogg, Huber, Hansen,
Todd, & Evans were on brief, for appellee Verizon New England, Inc.
Thomas A. Barnico, Assistant Attorney General, with whom
Thomas F. Reilly, Attorney General, was on brief, for appellee
Massachusetts Department of Telecommunications and Energy.

January 19, 2005

**LYNCH**, **Circuit Judge**. This appeal represents one part of a larger dispute between Global NAPs, a competitive local exchange carrier (CLEC), and Verizon New England, Inc., an incumbent local exchange carrier (ILEC), in their attempt to reach an interconnection agreement under the Telecommunications Act of 1996 (TCA), Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.). The TCA sets up detailed procedures for the creation of interconnection agreements in order to serve the TCA's goal of fostering competition in local telephone markets. Those procedures allow competing carriers to gain access to the incumbent carrier's telecommunications network and facilities and govern the terms and fees of that access.

Global NAPs appeals from the district court's judgment affirming a February 19, 2003 order of the Massachusetts Department of Telecommunications and Energy (DTE), the state commission given the power to arbitrate disputes over interconnection agreements under the TCA. 47 U.S.C. § 252(b). The February 19, 2003 administrative order followed an earlier December 12, 2002 DTE order deciding the arbitration between Verizon and Global NAPs. That arbitration had been initiated by Global NAPs after a period of negotiation with Verizon failed to produce an agreement on all issues.

The challenged February 19 order allowed a remedial motion by Verizon to force Global NAPs to sign an interconnection

-2-

agreement consistent with the terms of the DTE's earlier December 12 arbitration order. Verizon brought this motion because Global NAPs had balked at the December 12 arbitration order, said it was not bound by the result of the arbitration, and that it was instead exercising what it thought was its unconditional right under § 252(i) of the Act to adopt the terms of an interconnection agreement Verizon had with Sprint, which preexisted Global NAPs' arbitration request.

The merits of the underlying December arbitration order from the DTE are not before us. The merits issue before us is whether in its February order the DTE acted in violation of § 252(i) of the TCA in precluding Global NAPs from nullifying and avoiding the effect of the arbitration -- which binds Global NAPs and Verizon to an agreement -- by instead opting into the terms of an older agreement Verizon had signed with Sprint. If Global NAPs were free to so opt in, that would moot the challenge to the underlying December arbitration order. We find that the DTE's February 19 order was not in violation of the TCA and affirm the district court.

## I.

Before the passage of the TCA, local telephone service was provided mainly by state-regulated monopolies, such as Verizon. These monopolies, the ILECs, owned all networks and facilities (including telephone lines, poles, trunks, etc.) attendant to the

provision of local telephone service.  See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999).  A purpose of the TCA was to end the local telephone monopolies and create a national telecommunications policy that strongly favored competition in local telephone markets.  See P.R. Tel. Co. v. Telecomm. Regulatory Bd. of P.R., 189 F.3d 1, 7 (1st Cir. 1999).

Section 251 of the TCA imposes obligations on both competing carriers and incumbent carriers.  Section 251(a)(1) imposes a duty on all carriers "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers."  47 U.S.C. § 251(a)(1).  The TCA imposes on an incumbent carrier more stringent duties, including "the duty to permit other carriers to interconnect with its facilities, to provide other carriers with access to elements of its local network on an 'unbundled' basis, to sell to other carriers at wholesale prices the services that it provides to its customers, and to negotiate interconnection agreements in good faith."  P.R. Tel. Co., 189 F.3d at 8; see 47 U.S.C. § 251(c).

Section 252 provides the procedures for the creation of interconnection agreements.[1]  Interconnection agreements govern the

_____

[1]    In addition to pursuing an interconnection agreement, a competitor may also seek access to the incumbent's network by purchasing local telephone services at wholesale rates for resale to end users or by leasing elements of the incumbent's network on an "unbundled basis."  47 U.S.C. § 251(c); U.S. West Communication, Inc. v. Sprint Communication Co., 275 F.3d 1241, 1244 (10th Cir. 2002).

-4-

terms and conditions by which CLECs may gain access to the ILECs' local telephone network and facilities, thus allowing the CLECs to provide competing local telephone service. Incumbents and competitors may negotiate freely an interconnection agreement, and both parties have a duty to negotiate in good faith. 47 U.S.C. § 251(c)(1). If the parties reach an agreement through negotiation, that agreement need not satisfy the substantive requirements of §§ 251(b) and (c). Id. § 252(a)(1). If after a period of negotiation the parties are not able to come to an agreement on some issues, either party may petition a state commission to decide those open issues in arbitration. Id. § 252(b)(1). The commission then has the authority to decide the open issues between the parties, and to impose conditions on the parties for the implementation of the terms of arbitration into an agreement. Id. § 252(b)(4)(C). In deciding those issues, the commission must "ensure that such resolution and conditions meet the requirements of section 251 of this title, including the regulations prescribed by the [Federal Communications Commission] pursuant to section 251." Id. § 252(c)(1). Further, either party's refusal to negotiate or to cooperate with the state commission acting as arbitrator constitutes a breach of its duty to negotiate in good faith. Id. § 252(b)(5).

In addition, the TCA requires ILECs to allow any requesting CLEC to adopt the terms and conditions of any

-5-

interconnection agreement it has with any other CLEC, provided that agreement has been approved by the requisite state telecommunications commission. Id. § 252(i).

Once a negotiated or arbitrated agreement is completed, it must be submitted to the state commission for approval. Id. § 252(e)(1). The commission may reject any negotiated agreement if it discriminates against a third party carrier or if its implementation is "not consistent with the public interest, convenience, and necessity." Id. § 252(e)(2)(A). The commission may reject an arbitrated agreement if it fails to meet the substantive requirements of § 251, including the FCC's implementing regulations, or the pricing standards set forth in § 252(d). Id. § 252(e)(2)(B). That commission decision is subject to federal judicial review:

> In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

Id. § 252(e)(6).

Verizon and Global NAPs began the negotiation process for a new interconnection agreement in early 2002, because their previous agreement was approaching expiration. On July 30, 2002, Global NAPs filed a petition with the DTE to arbitrate several issues on which the parties could not agree. The DTE issued an

-6-

order on December 12, 2002, resolving all open issues and ordering the parties to incorporate the arbitrated terms into an agreement and file that agreement with the DTE within 21 days, or by January 2, 2003.  The DTE allowed the parties' joint motion for extension of time to file the agreement until January 17, 2003.

On December 30, 2002, Global NAPs brought an action in federal district court challenging the merits of the DTE's arbitration determination.[2]  The merits of that December 12, 2002 DTE order are not before us.

On January 9, 2003, Global NAPs informed Verizon that, rather than entering into the agreement embodying the DTE's arbitration decision, it would seek to adopt the terms of a preexisting December 19, 2001 agreement Verizon had with Sprint ("Sprint agreement").  Global NAPs contended that it has an unconditional right to do so pursuant to 8 U.S.C. § 252(i).  Global NAPs said its adoption of the preexisting Sprint agreement was consistent with the arbitration order, under which Global NAPs retained its § 252(i) rights.

On January 16, 2003, Global NAPs informed the DTE of its intention to opt into the Sprint agreement, in place of the

_____

[2]      The most important contested issue in that arbitration between the parties relates to the reciprocal compensation requirements between ILECs and CLECs for toll-free calls placed by the ILEC's customers to a CLEC's internet service provider (ISP) customers.  This issue has prompted much litigation, including issues concerning the validity of FCC rulings on the issue.  See, e.g., WorldCom, Inc. v. FCC, 288 F.3d 429 (D.C. Cir. 2002).

arbitrated agreement. In response, on January 17, 2003, Verizon filed a motion with the DTE to approve the arbitration order, seeking, in essence, to force Global NAPs to execute an agreement consistent with the arbitration order, or alternatively, should the DTE allow Global NAPs to opt into the Sprint agreement, to order that the "agreement be modified to reflect the [DTE]'s legal and policy determinations set forth in the Arbitration Order."

On February 19, 2003, the DTE granted the initial portion of Verizon's motion and ordered the parties to sign and file an agreement consistent with the initial arbitration order. That February 19, 2003 order is the subject of this appeal. All parties agree that this order left Global NAPs free to challenge the substance of the December 12, 2002 arbitration order.

In the February 19 order, the DTE rejected Global NAPs' claim that it retained the unconditional right to opt into the Sprint Agreement even after the DTE issued its arbitration order. The DTE first held that a final arbitration order pursuant to § 252(b) is binding on both parties,[3] noting that it had always

_____

[3] The DTE also rejected Global NAPs' claim that when the FCC stated, in the Local Competition Order ¶ 1293, that "competing providers do not have an affirmative duty to enter into agreements under section 252," the FCC meant that CLECs were not bound by the results of an state arbitration under § 252(b). Local Competition Order, 11 F.C.C.R. 15499, 16131 (1996). Rather, the DTE held that a fuller reading of the TCA and FCC rules shows that this paragraph stood for the narrower proposition that competing carriers, unlike incumbents, cannot be forced to enter into an interconnection agreement, but rather can purchase services directly through the incumbent's tariff. The DTE held that it does not mean that CLECs

-8-

required that arbitration be binding on both parties. It held that its rule that arbitrations be binding on both parties was consistent with FCC regulation. See 47 C.F.R. § 51.807(h). Further, the DTE noted that the FCC's Local Competition Order, which embodies the FCC's initial post-enactment interpretation of the statute, stated that the states may consider the FCC's rules when implementing their own standards for arbitration. See Local Competition Order, 11 F.C.C.R. 15499, 16127 (1996).

Further, the DTE held that since the arbitration order directed the parties to file an agreement containing the arbitrated terms, and provided no alternatives, Global NAPs' attempt to opt into the Sprint agreement was in violation of that earlier order. The DTE held that "[t]he § 252(i) adoption process permits a CLEC, during the negotiation process, to opt into another carrier's contract, not to do so after a decision has been reached through arbitration."

It also noted that Global NAPs' interpretation of the TCA was contrary to public policy, as it would allow carriers to "game the system" by always attempting to arbitrate, and if unhappy with the results, merely to opt into an existing agreement.[4] The DTE

_____

can avoid the terms of a valid arbitration order.

[4] The DTE reasoned that competing carriers would have no incentive to negotiate and would always seek arbitration, because the ability to opt into an existing agreement post-arbitration would mean that such competitors could only benefit and never be made worse off by arbitration. That would waste the DTE's limited

ordered the parties to file an agreement consistent with the initial arbitration order within seven days. The parties signed and entered an agreement consistent with the court's ruling, under Global NAPs' protest. The DTE did not, contrary to Global NAPs' assertion, hold that a party to an arbitrated agreement can never exercise rights under § 252(i). It also did not, contrary to Verizon's assertion, hold that a party subject to a valid arbitration order could never, under § 252(i), take advantage of terms in a previously available agreement.

On March 6, 2003, Global NAPs filed a second action in district court, this time challenging the DTE's February 19 order.

On March 11, 2003, all parties to the second litigation (Global NAPs, Verizon, and the DTE) filed a joint motion to consolidate Global NAPs' two actions. In that motion, the parties proposed that the district court rule on Global NAPs' challenge of the DTE's February 19 order -- whether Global NAPs is permitted to opt into the Sprint Agreement -- prior to ruling on its challenge to the DTE's underlying arbitration order -- the merits of the arbitration agreement. The district court granted the motion and accepted the parties' briefing schedule, under which the parties filed cross motions for summary judgment in the first action on the issue whether § 252(i) would permit Global NAPs to opt into the Sprint agreement despite the existence of the DTE's arbitration

resources and be unduly burdensome to incumbents.

order to the contrary. The district court granted Verizon's and the DTE's motions for summary judgment, and denied Global NAPs' motion. Global NAPs timely appealed.

## II.

<u>Appellate Jurisdiction</u>

The parties agree the federal courts have subject matter jurisdiction to review state agency determinations under the TCA for compliance with federal law, pursuant to 28 U.S.C. § 1331. <u>Verizon Md., Inc.</u> v. <u>Public Serv. Comm'n of Md.</u>, 535 U.S. 635, 642 (2002). <u>See</u> <u>also</u>, 47 U.S.C. § 252(e)(6).

Verizon initially argues that this court lacks appellate jurisdiction to hear Global NAPs' appeal due to (1) the lack of a final judgment under 28 U.S.C. § 1291 and (2) lack of standing in Global NAPs. The DTE does not join Verizon in arguing lack of appellate jurisdiction or lack of standing, but briefs the case on the merits.

Verizon argues that the district court's ruling was not a final judgment because Global NAPs' two actions were consolidated, thus rendering them one case, and the grant of summary judgment disposed of only one of the two consolidated cases. This argument is without merit. The disposition of one case in a consolidated action is a final and appealable judgment unless the cases were consolidated "for all purposes." <u>See</u> <u>Bay State HMO Management, Inc.</u> v. <u>Tingley Sys., Inc.</u>, 181 F.3d 174, 178

-11-

n.3 (1st Cir. 1999). In moving to consolidate these cases, the parties expressly requested that the district court review the February 12, 2003 DTE order before proceeding with its review of the December 12, 2002 order, and the district court agreed to do so.[5] Review of the merits of the December 12, 2002 arbitration order was, in essence, stayed pending the court's determination of the challenge to the second DTE order; the parties proposed completely separate briefing schedules for the review of the two consolidated cases. Verizon's claim that the cases were consolidated "for all purposes" is wrong and Verizon's last minute assertion is inconsistent with how it presented its case in the trial court.

These circumstances bring the case squarely within the bounds of In re Massachusetts Helicopter Airlines, Inc., 469 F.2d 439 (1st Cir. 1972). There, this court determined that the claims in a consolidated action remained separate, and therefore a Rule 54(b) determination was not required for appellate jurisdiction to be proper, because "[e]xcept for the consolidation of the[] cases for the convenience of pre-trial and trial procedure, the cases maintained their separate identities throughout the litigation. Separate judgments were entered in each of the five cases." Id. at 441. We found this to be consistent with the theory behind

---

[5] Further, we note that Verizon did not move to challenge jurisdiction upon the filing of Global NAPs' appeal, waiting instead until the filing of its brief to do so.

consolidation, which was a procedural mechanism meant to serve the purposes of judicial economy and convenience of the parties, as here, but not to alter the substantial rights the parties had in the separate actions.[6] <u>Id.</u>

Verizon relies on a notation in the district court docket from the clerk of court that the second complaint, i.e. the present case, was consolidated "for all future proceedings," and that this removes it from the <u>Massachusetts Helicopter</u> rule. <u>See</u> <u>Bay State HMO Management, Inc,</u> v. <u>Tingley Sys., Inc.</u>, 181 F.3d 174, 178 n.3. The reality of the situation is that the consolidation was for purposes of convenience and efficiency.

Verizon also urges us to overrule <u>Massachusetts Helicopter</u> in favor of the Ninth Circuit rule in <u>Huene</u> v. <u>United States</u>, 743 F.2d 703, 705 (9th Cir. 1984), also followed in <u>Trinity Broad. Corp.</u> v. <u>Eller</u>, 827 F.2d 673, 675 (10th Cir. 1987) and <u>Spraytex, Inc.</u> v. <u>DJS&T & Homax Corp</u>, 96 F.3d 1377, 1382 (Fed. Cir. 1996). The advantage, it says, of the Ninth Circuit rule is that it provides a bright line -- no ruling in a consolidated case may be appealed until there is an ultimate final judgment on all matters. That is true. The disadvantage of the rule is that it may cause injustice on particular facts, and the rule acts as a

---

[6]    Verizon's attempt to characterize the district court's order as a grant of partial summary judgment is in error. There is nothing in the district court's memorandum or judgment that suggests it was a grant of partial summary judgment.

-13-

disincentive which may prevent consolidation for purely pragmatic reasons of convenience and efficiency.

In any event, our adherence to the Massachusetts Helicopter rule was reaffirmed more recently in Bay State HMO Management, 181 F.3d at 178 n.3. As a panel, we are not free to overrule circuit precedent. The district court's grant of summary judgment is a final order within the meaning of 28 U.S.C. § 1291.

Verizon's challenge to Global NAPs' standing to pursue an appeal is also without merit. Verizon's claim of lack of standing seems to be predicated on the notion that, if Global NAPs is allowed to opt into the Sprint agreement, the DTE will construe the Sprint agreement in a manner consistent with the terms of the arbitration order, and thus Global NAPs will be no better off.

Global NAPs disagrees, and recites injury to itself. Further, Verizon's position is contrary to its position below in several respects. Among them is that Verizon requested from the DTE that, should the DTE allow Global NAPs to adopt the Sprint agreement, then the agreement be modified to adopt legal and policy determinations made in the arbitration order. If the Sprint agreement were not materially different from the challenged agreement, such modification would not be necessary. Indeed, Global NAPs would not be trying to join the Sprint agreement. Further, the possibility that the DTE might construe the Sprint agreement consistently with the December 12 arbitration order, and

-14-

that doing so would be upheld against a likely challenge, is insufficient to render Global NAPs without standing in this case. We reject the lack of standing argument.

**III.**

Interpretation of the TCA § 252(i)

The precise legal question under review is narrow, though one of first impression in the circuit courts of appeals: does a competing carrier have an unconditional right, under § 252(i) of the TCA, to avoid the terms of a final arbitration order from a state telecommunications commission, adjudicating a dispute between the CLEC and ILEC, by seeking to opt into the terms of a previous interconnection agreement that the ILEC has with another CLEC? This is an issue of federal statutory interpretation of the TCA.[7] We agree with the DTE and the district court that the TCA grants no such right.

Standard of Review

This circuit has not previously articulated precisely the standard of judicial review of state agency determinations under the TCA. Issues of law, as here, are subject to de novo review, P.R. Tel. Co. v. Telecomm. Regulatory Bd. of P.R., 189 F.3d 1, 7

---

[7]     Since the FCC, and not the individual state commissions, is the agency with the power granted by Congress to administer the TCA, through the formulation of policy, rulemaking, and regulation, we do not afford deference to the DTE's interpretation of the statute under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984).

(1st Cir. 1999), and we apply that standard to state agency determinations under the TCA.[8]

In interpreting a statute, we begin with the text. BedRoc Ltd. v. United States, 124 S. Ct. 1587, 1593 (2004). Section 252(i) states:

> A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement.

47 U.S.C. § 252(i). In urging the court to hold that § 252(i) gives it an unconditional right to avoid the terms of an arbitration order and opt into a previously available agreement, Global NAPs points out that the text of § 252(i) does not state

---

[8]     Each of the Circuits that has addressed the standard of review under the TCA has held that where the state agency determination rests principally on an interpretation of the TCA, de novo review is applied. See, e.g., Ind. Bell Tel. Co. v. McCarty, 362 F.3d 378, 383 (7th Cir. 2004); MCIMetro Access Transmission Servs. v. Bellsouth Telecomms., Inc., 352 F.3d 872, 876 (4th Cir. 2003); Coserv. Ltd. Liab. Corp. v. Southwestern Bell Tel. Co., 350 F.3d 482, 486 (5th Cir. 2003); U.S. West Communications, Inc. v. Sprint Communications Co., 275 F.3d 1241, 1248 (10th Cir. 2002); AT&T Communications of S. States, Inc. v. BellSouth Telecomm., Inc., 268 F.3d 1294, 1296 (11th Cir. 2001); AT&T Communications of N.J. v. Verizon N.J., Inc., 270 F.3d 162, 169 (3d Cir. 2001); U.S. West Communications., Inc. v. MFS Intelenet, Inc. 193 F.3d 1112, 1117 (9th Cir. 1999). Further, other Circuits have held that where no error of law exists, the state agency's other determinations are reviewed under the arbitrary and capricious standard. See, e.g., MCI Telecomms. Corp. v. Ohio Bell Tel. Co., 376 F.3d 539, 548 (6th Cir. 2004); U.S. West Communications, Inc., 275 F.3d at 1248; Southwestern Bell Tel. Co. v. Waller Creek Communications, Inc., 221 F.3d 812, 816 (5th Cir. 2000); MFS Intelenet, 193 F.3d at 1117.

-16-

expressly when and under what circumstances the incumbent must make interconnection agreements available to other competitors. From this silence, Global NAPs argues it is free to opt in at any time it chooses. But § 252(i) does not expressly state what Global NAPs reads it to mean either. At best, § 252(i) is ambiguous on the subject, if that section is read alone. The absence of an express statement in § 252(i) does not end the matter; the section must be read in light of the structure and intent of the statute.

Global NAPs' broad reading of § 252(i) is incorrect, because that reading brings § 252(i), under the circumstances of this case, into direct conflict with, and in important aspects negates, several other sections of the TCA.

Global NAPs' reading is inconsistent with the basic arbitral power vested in the state commission. Section 252(b), entitled "Agreements arrived at through compulsory arbitration," allows for either party to an interconnection agreement to petition a state commission for arbitration of open issues, and grants powers to the state commission to carry out the arbitration. Id. § 252(b).

Global NAPs' reading is also inconsistent with the power of state commissions to make their arbitral decisions binding on both parties. Section 252(b)(4)(C) requires the state commission to "resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement

-17-

subsection (c) of this section upon the parties to the agreement." Id. § 252(b)(4)(C). In turn, subsection (c), among other things, states that "a State commission shall . . . provide a schedule for implementation of the terms and conditions by the parties to the agreement." Id. § 252(c). By allowing the commission acting as arbitrator to place conditions on both parties for the implementation of interconnection agreements, it is clear that § 252(b)(4)(C) intends for arbitration orders to be binding on both parties.

Global NAPs responds that arbitration orders are not binding because generally under the TCA, the obligations on CLECs are not equal to or reciprocal with those on ILECs and so arbitration decisions are equally asymmetrical in their results. Global NAPs also makes a broader argument that the FCC's regulations, and the TCA generally, create asymmetrical rights and obligations on competitors and incumbents, and those greatly tip the scale in favor of competitors. It argues that under § 252 incumbents are required to enter into interconnection agreements, but competitors are not. Thus Global NAPs argues that, to the extent there is ambiguity as to the scope of § 252(i), it should be construed broadly in favor of competitors and against the incumbent, consistent with the asymmetry created by the statute and regulations as a whole.

-18-

This argument, however, ignores the important fact that § 252(b) is <u>not</u> one of the areas of the TCA that creates asymmetrical obligations on the parties. Section 252(b)(1) allows either party to the negotiation to petition for arbitration. Section 252(b)(4) allows the state commission to impose conditions on both parties in order to carry out the arbitration. And § 252(b)(5) creates a duty for both parties to cooperate with the arbitration at the risk of breaching the duty both parties have, under § 252(a), to negotiate in good faith. There is no basis for Global NAPs' reading § 252(i) as somehow turning the parallel obligations that run throughout § 252(b) into merely one-way obligations.

Further, Global NAPs' reading is in conflict with the statutory duties of good faith and cooperation with the commission as arbitrator. The TCA, at § 252(b)(5), states:

> The refusal of any other party to the negotiation to participate further in the negotiations, to cooperate with the State commission in carrying out its function as an arbitrator, or to continue to negotiate in good faith in the presence, or with the assistance, of the State commission shall be considered a failure to negotiate in good faith.

<u>Id.</u> § 252(b)(5). In attempting to void the terms of a valid arbitration order, it is clear that Global NAPs is refusing to

-19-

cooperate with the DTE, in violation of its duty to negotiate in good faith.[9]

Global NAPs responds by asking the court to read an implicit limitation on the good faith requirement of § 252(b)(5) -- that CLECs are not bound by the terms of § 252(b)(5) if they attempt to opt into a previously available contract. Global NAPs says that this is the effect of § 252(i). But § 252(i) says nothing of the sort. Rather, it is written in terms of an obligation on the part of ILECs to make agreements available to potential CLECs, not as an unconditional right on the part of CLECs to modify their clear obligations under earlier subsections of § 252. We read the sections consistently, and conclude that § 252(i) is not an implicit limit on the binding effect of the arbitration provisions of § 252(b)(5). In this context, there is nothing ambiguous about the terms of § 252(b)(4)(C) and (b)(5).

Global NAPs' argument is also inconsistent with the judicial review provisions in the TCA, for determinations made by a state commission:

---

[9]     The record is clear that the DTE did not consider its order to be a penalty. Rather, the DTE held that § 252(i) could not be read to allow Global NAPs to void the terms of the binding arbitration order by opting into an agreement available to them throughout the entire period of negotiation and arbitration.

-20-

> In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

47 U.S.C. § 252(e)(6).  If "any party aggrieved by a determination" feels the arbitral determination is contrary to the TCA, its remedy is through judicial review, not self-help.

In addition to our reading of the statutory sections, there is another source of law to consider: FCC regulations interpreting the statutory sections at issue, albeit on different points.  The FCC's interpretation is relevant in two senses.  First, under § 252(c)(1), the DTE itself must "ensure that such resolution and conditions meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251."  Id. § 252(c)(1).  Second, to the extent there is ambiguity in the statute, present here in § 252(i) but not in § 252(b)(4)(C) and (b)(5), deference is due to the FCC's reasonable interpretation.  Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984).[10]

The FCC has not interpreted the statute on the precise question before us.  That is not surprising, since the issue is one

---

[10]    The FCC is explicitly granted rulemaking authority under the TCA, 47 U.S.C. § 201(b), and the Supreme Court has held that this includes rulemaking power for §§ 251 and 252, without being limited to interstate and foreign matters.  AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 378 (1999).

-21-

of the power of a state commission. The TCA is an interwoven whole and the FCC's interpretation of related strands of the weaving is relevant, at least by analogy.

Both sides cite to the FCC's regulation interpreting § 252(i), found at 47 C.F.R. § 51.809, in support of their interpretation of the statute. The regulation, 47 C.F.R. § 51.809(b), provides two express limitations to a CLEC's opt in rights under § 252(i): an incumbent need not make available the terms of an interconnection agreement to a particular competitor 1) if it shows that the costs of providing a service will be greater to the requesting competitor than it was to the original negotiating party, or 2) if it shows that the provision of that service is technically infeasible. 47 C.F.R. § 51.809(b). In addition, there is a third limitation: 47 C.F.R. § 51.809(c) states that incumbents must make terms of interconnection agreements available to other competitors only "for a reasonable time" after their approval by the state commission.

The FCC regulation 47 C.F.R. § 51.809 itself rejects Global NAPs' premise that § 252(i) grants an unconditional right to CLECs to adopt the terms of any interconnection agreement the ILEC has with another CLEC. The obligation of ILECs to make those agreements available to other CLECs is itself subject to conditions: comparable-cost, technical-feasibility, and the

reasonable-time restrictions are three such conditions contemplated by the regulation.[11]

The reasonable-time requirement under 47 C.F.R. § 51.809(c) is particularly relevant. Here, after all, the DTE has said it might have reached a different outcome if, during the pendency of an arbitration, Global NAPs had sought to withdraw its request for arbitration in favor of exercising whatever opt in rights it had. The DTE held only that once it had concluded its arbitration and issued its order, Global NAPs was not free to enter into an opt in agreement in lieu of accepting arbitrated terms and incorporating them into its agreement. The DTE's position is entirely consistent with the FCC regulation's reasonable-time requirement.

We also consider the parties' arguments based on the FCC's Local Competition Order, which embodies the FCC's initial interpretative rulemaking implementing the TCA after its passage in 1996, as support for its interpretation of the statute. See 11 F.C.C.R. 15499 (1996). Global NAPs attempts to argue that while FCC arbitrations are binding on both parties, 47 C.F.R. § 51.807(h), the Local Competition Order demonstrates that arbitrations before state agencies under § 252(b) are only binding

_____

[11] The reasoning provided for our reading of the statute above, consistent with the entirety of § 252, adequately dispels Global NAPs' argument that the limitations on § 252(i) promulgated by the FCC in § 51.809 are the only permissible limitations that could apply to that subsection.

-23-

on incumbents.  It makes a sort of negative pregnant argument from the FCC's Local Competition Order ¶ 1293, which states:

> Absent mutual agreement to different terms, the decision reached through arbitration is binding.  We conclude that it would be inconsistent with the 1996 Act to . . . permit incumbent LECs to not be bound by an arbitrated determination.  We also believe that, although competing carriers do not have an affirmative duty to enter into agreements under section 252, a requesting carrier might face penalties if, by refusing to enter into an arbitrated agreement, that carrier is deemed to have failed to negotiate in good faith.

11 F.C.C.R. at 16131.  Global NAPs contends that this renders the arbitration provision a one-way ratchet: incumbents are bound by the arbitration decision, but competitors are not.  We disagree. The Order does not say that competitors are not required to accept the terms of an arbitration order.  Rather it says that competitors are not required "to enter into agreements under section 252," and this is clearly correct.  The law mandates that an incumbent must enter into an interconnection agreement under the requisite conditions, and the competitor need not enter into an agreement even if the incumbent so desires.  It says nothing about the obligations of a competitor that is subject to the terms of a binding arbitration order.

Significantly, the Local Competition Order does not state that competitors have a right to use § 251(i) to avoid their obligations under a binding arbitration order.  Properly read the

-24-

Order refers to the admitted binding effect in FCC arbitrations, but says nothing about state arbitrations. Further, the FCC regulation's explicit statement of the binding effect on both parties supports the DTE's position. See 47 C.F.R. § 51.807(h).

Global NAPs then makes another argument based on lack of symmetry as to most favored nation clauses. Global NAPs cites to Local Competition Order ¶ 1316, as well as the Tenth Circuit's decision in U.S. West Communications, Inc. v. Sprint Communications Co., 275 F.3d 1241 (10th Cir. 2002), to support its interpretation of § 252(i). Neither is helpful to Global NAPs' position. Paragraph 1316 of the Local Competition Order states:

> We further conclude that section 252(i) entitles all parties with interconnection agreements to "most favored nation" status regardless of whether they include "most favored nation" clauses in their agreements. Congress's command under section 252(i) . . . means that any requesting carrier may avail itself of more advantageous terms and conditions subsequently negotiated by any other carrier for the same individual interconnection, service, or element once the subsequent agreement is filed with, and approved by, the state commission.

11 F.C.C.R. at 16139-40 (emphasis added). Paragraph 1316's "most favored nation" language deals with an issue not presented here: the ability of a party to an existing interconnection agreement to adopt the terms of another carrier's agreement that is subsequently approved by a state commission. The DTE's decision said nothing

about Global NAPs' § 252(i) rights to adopt terms in subsequently approved agreements, nor does our decision here do so.

Global NAPs' reliance on U.S. West suffers from a similar problem. The question that court faced was whether the state commission acting as arbitrator properly interpreted § 252(i) to allow a competitor to amend its interconnection agreement to take advantage of an incumbent's tariffs, as opposed merely to an element in another competitors' approved interconnection agreement, that are more favorable than the prices in its agreement. U.S. West, 275 F.3d at 1249. The case did not say that a CLEC subject to a binding arbitration order can use § 252(i) to avoid the terms of that order and adopt completely the terms of a previously available agreement.

Global NAPs makes a final, policy-based argument that reading § 252(i) to prevent it from opting into the Sprint agreement post-arbitration is both anti-competitive and discriminatory, and thus at odds with the purpose of the TCA. If what Global NAPs alleges were true, namely that the terms of the underlying arbitration order are either contrary to law or unduly burdensome on Global NAPs (or both), the statute provides Global NAPs with a remedy -- direct review of the terms of the arbitration order in district court. 47 U.S.C. § 252(e)(6). This is the remedy Congress provided.

Accordingly, we **affirm**. Costs are awarded to Verizon.