THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
February 14, 2013

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Embarcadero Technologies, Inc.

v.

RStudio, Inc.

_____

Opposition No. 91193335
to applications Serial Nos. 77691980, 77691984 & 77691987
all filed on March 16, 2009

_____

Martin R. Greenstein, Mariela P. Vidolova, and Leah Z. Halpert of TechMark a Law Corporation for Embarcadero Technologies, Inc.

Julia Huston, Charles E. Weinstein, Joshua S. Jarvis, and Anthony E. Rufo of Foley Hoag LLP for RStudio, Inc.

_____

Before Bucher, Wellington, and Ritchie, Administrative Trademark Judges.

Opinion by Wellington, Administrative Trademark Judge:

Embarcadero Technologies, Inc. (hereinafter, "opposer"), has opposed three applications of RStudio, Inc. ("applicant"), to register the mark RSTUDIO, in standard character form, covering the following goods and services:

> Computer software for statistical computing; computer software for software applications development in International Class 9;

Providing training in the use of computer software; providing training in the use of statistical methods and related computer software in International Class 41; and

Application service provider (ASP) featuring software for statistical computing and software applications development; computer software consultation; design and development of computer software; technical support services, namely, troubleshooting of problems with computer software programs in International Class 42.[1]

Registration of applicant's mark in connection with the applied-for goods and services is opposed on the ground of priority and likelihood of confusion. Specifically, opposer alleges that it "is the owner of the trade name and trademark **ER/STUDIO**, having used said name and mark continuously in interstate commerce on and in connection with computer software and related services since long prior to the March 16, 2009 [filing date of the three opposed applications]"; and that "[s]imultaneous use by Applicant of the alleged mark **RSTUDIO** on the goods and services set forth in [the three opposed applications], and Opposer Embarcadero's **ER/STUDIO** mark on its goods and related services … is likely to cause confusion, mistake or deception among purchasers, users and the public, thereby damaging Opposer."[2]  Opposer pleaded ownership of U.S.

---

[1] Application Serial Nos. 77691980, 77691984, and 77691987, in order respectively for each recited class of goods/ services. The applications were filed on March 16, 2009, based on Section 1(b)(*bona fide* intent to use the mark in commerce).
[2]   In the Notice of Opposition, opposer also alleged that "Applicant did not have the requisite bona fide intent to use the

Registration No. 2203227 for the mark ER/STUDIO, in typed character form, for "entity relationship modeling software for SQL databases" in International Class 9.[3]

In its answer, as amended, applicant admitted certain allegations regarding the filing of its applications, and also admitted that opposer is the owner of the pleaded registration. Applicant otherwise denied the other salient allegations in the notice of opposition.

---

[mark] RSTUDIO … on all of the goods and services set forth [in the applications] in commerce or otherwise at the time of filing the [opposed applications], and the applications are thus void *ab initio*." However, opposer did not pursue this claim in its trial briefs, and therefore we consider this claim to be waived.

Similarly, in opposer's trial brief, opposer states that the grounds for opposition include "a false suggestion of connection under Section 2(a) of the Trademark Act of 1946, 15 U.S.C. § 1052(a)." Opposer's Brief at 8. However, opposer later states in that same brief that the "sole issue" to be determined by the Board is likelihood of confusion between the applied-for marks and opposer's mark. Opposer's Brief at 11. We further note that although the terms "false suggestion of a connection" and "Section 2(a)" are listed in the cover sheet generated by the Office's online filing electronic database (ESTTA) as "grounds for opposition," the ground was not sufficiently pleaded or otherwise elaborated upon in the attached notice of opposition. Although the content of the ESTTA cover sheet is read in conjunction with the notice of opposition as an integral component, *PPG Industries Inc.* v. *Guardian Industries Corp.*, 73 USPQ2d 1926, 1928 (TTAB 2005), the mere mention of a ground therein is insufficient. *Cf. Melwani v. Allegiance Corp.,* 97 USPQ2d 1537 (TTAB 2010). For purposes of properly pleading a claim of false suggestion of a connection under Section 2(a), see *Petroleos Mexicanos v. Intermix S.A.*, 97 USPQ2d 1403 (TTAB 2010), and authorities cited therein. Accordingly, and in view of the fact that opposer has not provided any arguments or evidence regarding a Section 2(a) claim, we consider this ground also to be waived.

[3] Registered November 10, 1998, renewed.

<u>Applicant's Motion to Amend the Application/Section 18</u>

Prior to the close of discovery in this proceeding, applicant moved to amend the descriptions of its goods and services in the applications "in the event that the Board deems such amendments necessary to dismiss the opposition."[4]

The proposed amended goods and services read as follows:

> Application Serial No. 77691980: "Computer software for <u>advanced</u> statistical computing~~; computer software for software applications development~~ <u>using the R computing language and the data from two dimensional datasets</u>" in International Class 9;

> Application Serial No. 77691984: "Providing training in the use of computer software <u>for advanced statistical computing using the R computing language and data from two dimensional datasets</u>; providing training in the use of <u>advanced</u> statistical methods ~~and related computer software~~ <u>using the R computing language and data from two dimensional datasets</u>" in International Class 41; and

> Application Serial No. 77691987: "Application service provider (ASP) featuring software for <u>advanced</u> statistical computing ~~and software applications development~~ <u>using the R computing language and data from two dimensional datasets</u>; ~~computer software~~ consultation <u>regarding computer software for advanced statistical computing using the R computing language and data from two dimensional datasets</u>; design and development of computer software <u>for advanced statistical computing using the R computing language and data from two dimensional datasets</u>; technical support services, namely, troubleshooting of problems with computer software ~~programs~~ <u>for advanced statistical computing using the R computing language and data from two dimensional datasets</u>" in International Class 42.

---

[4] Applicant's motion filed November 10, 2010.

(for ease of reference, we have shown additions in underline, and deletions in strikethrough).

Applicant's motion was filed without the consent of opposer, and opposer indeed filed its opposition to the proposed amendments.[5]  In an order issued on November 29, 2010, the Board stated that action on the motion would be deferred until final decision.  Accordingly, we now consider said motion.

Section 18 of the Lanham Act gives the Board the equitable power to, *inter alia*, "restrict the goods or services identified in an application or registration."  15 U.S.C. Section 1068.  Pursuant to Section 18 and in conjunction with a motion to amend, a defendant may assert an affirmative defense by moving to restrict its own goods and/or services in order to avoid any likelihood of confusion alleged by the plaintiff.  *Id.*; Trademark Rule 2.133.  *See also* TBMP Section 311.02(b) (2012) and cases cited therein.  In order for such an affirmative defense to be considered, it must be promptly asserted and the proposed restriction must be set forth in sufficient detail and with an explanation or allegation as to how the restriction alleviates the likelihood of confusion.  *Cf., ProQuest Information and Learning Co. v. Island*, 83 USPQ2d 1351, 1353-54 (TTAB 2007) (applicant failed to state with

5

precision how restriction of its own application would aid in avoidance of confusion); *Tea Board of India v. Republic of Tea Inc.,* 80 USPQ2d 1881, 1898 (TTAB 2006) (applicant's offer to amend its identification of goods given no further consideration because it would not overcome the likelihood of confusion); and *British Seagull Ltd. v Brunswick Corp.,* 28 USPQ2d 1197 (TTAB 1993), *aff'd*, 35 F.3d 1527, 32 USPQ2d 1120, 1125 (Fed. Cir. 1994) (Board had no duty to address applicant's offer to amend in final brief where applicant failed to file a motion to amend or include proposed amendment as an affirmative defense in pleading).  Ideally, the Section 18 affirmative defense should be asserted in the defendant's answer to put the plaintiff on notice and shortly thereafter followed by a corresponding motion to amend the application.

In its answer, applicant does not assert the Section 18 affirmative defense or otherwise raise the issue of a restriction to its descriptions of goods and services. Nevertheless, we find applicant's alternative request to restrict its descriptions of goods and services timely inasmuch as its motion was filed before the close of discovery.  Moreover, the issue of the proposed restriction was clearly tried by the parties and argued in their respective trial briefs.  Accordingly, we deem the answer in

---

[5] Opposer's brief of November 30, 2010.

this proceeding to be amended to include the Section 18 affirmative defense.  Fed. R. Civ. P. 15(b).

We further note that the Section 18 affirmative defense is raised in the alternative; applicant did not explicitly consent to judgment being entered against it with respect to the original, broader descriptions of goods and services. In its trial brief, applicant focuses the bulk of its arguments against finding a likelihood of confusion based on the restricted, narrower scope of applicant's goods and services.  Nevertheless, applicant also suggests the amendments may not be "necessary" and requests that the Board offer applicant the option to reconsider entry of the amendments "in the event that the Board determines that applicant is entitled to registration of its mark even without the proposed amendments."  Brief, p. 31.

With the above in mind, we address applicant's Section 18 affirmative defense in this decision, as requested, in the alternative.  That is, we have considered the original, unamended descriptions of goods in our likelihood of confusion analysis, and upon finding a likelihood of confusion therewith, we have also considered whether applicant has established its Section 18 affirmative defense, *i.e.*, whether the proposed restrictions negate the likelihood of confusion.

The Record

By rule, the record includes the involved application files. Trademark Rule 2.122(b), 37 C.F.R. 2.122(b). The pleadings are also automatically of record.

In addition, opposer has submitted the testimony of Jason Tiret, opposer's Director of Modeling and Design Solutions in the Product Management Department, with attached exhibits.[6]  Opposer also filed two notices of reliance on the following materials:

1. Printouts from applicant's website dated February 28, 2011;

2. Rule 30(b)(6) deposition of RStudio, Inc. and of Joseph J. Allaire, applicant's CEO, with attached exhibits;[7]

3. Excerpts from the book *R in a Nutshell* by Joseph Adler;

4. Copy of an article "RinRuby: Accessing the R Interpreter from Pure Ruby" by David B. Dahl and Scott Crawford from the *Journal of Statistical Software*;

5. Copy of an article "Collaborative Software Development Using R-Forge" by Stefan Theuβl and Achim Zeileis from *The R Journal*;

6. Copy of an online article "Calling Ruby, Perl or Python from R";

7. Webpage printouts from the RubyForge website http://rubyforge.org/projects/rsruby;

---

[6] Hereinafter cited to as "Tiret Dep. [page]:[line(s)]."
[7] Hereinafter cited to as "Allaire Discov. Dep. [page]:[line(s)]."

8. Printouts from webpage entitled "What is R?" from the R-Project's website http://www.r-project.org/about.html;

9. Printouts from the "useR! The R User Conference 2010" webpage http://user2010.org;

10. Printouts from the online blog article "Revolution Analytics Targets R Language, Platform at Growing Need to Handle 'Big Data' Crunching";

11. Various definitions of the word "statistics";

12. Printouts from opposer's website;

13. Printouts from applicant's website dated May 25, 2011;

14. White paper entitled "R: An Open Source Statistical Environment" by Valentin Todorov;

15. Copy of the book *Using R for Actuarial Science* by Shyamal Kumar;

16. Copy of the online article "Scenarios for Using R within a Relational Database Management System Server" by Duncan Temple Lang;

17. Excerpts from the manual *R Data Import/Export*;

18. The article "Improving the Analysis, Storage and Sharing of Neuroimaging Data Using Relational Databases and Distributed Computing" by Uri Hasson et al.; and

19. Opposer's website and user guides.

Applicant, during its trial period, filed the testimony of Joseph J. Allaire, applicant's CEO, with attached exhibits.[8] Applicant also filed a notice of reliance on the following materials:

---

[8] Hereinafter cited to as "Allaire Dep. [page]:[line(s)]."

1. Rule 30(b)(6) discovery deposition of Jason Tiret, with attached exhibits;[9]

2. Opposer's response to applicant's interrogatory No. 14;

3. Excerpts from the book *R in a Nutshell* by Joseph Adler;

4. Applicant's website dated April 18, 2011;

5. A collection of fifty (50) web pages showing use of the word "studio";

6. A collection of fifty (50) web pages showing use of the term "ER";

7. Opposer's listings of its software from its website;

8. Prices for opposer's goods taken from opposer's website; and

9. The Wikipedia article "Comparison of Statistical Packages."

<u>Background Discussion</u>

Before we address the merits of this opposition, we offer the following background regarding the parties and their software products and services. In doing so, we acknowledge from the outset that our likelihood of confusion determination is, and must be, confined to the identifications of goods set forth in the applications and pleaded registration, in addition to any prior common law rights established by opposer. See *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889 (Fed. Cir. 1991); *Octocom Systems Inc. v. Houston Computers*

---

[9] Hereinafter cited to as "Tiret Discov. Dep. [page]:[line(s)]."

*Services Inc.*, 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990); and *CBS Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198 (Fed. Cir. 1983).

A.  Applicant's Software and Services

Applicant was founded in 2008 by its CEO, Mr. Allaire, and the RSTUDIO software product was subsequently developed by applicant.  The descriptions of applicant's goods and services, as currently found in the applications and unamended, describe the function of the RSTUDIO software product in fairly broad terms.  That is, based on a reading of the identification of goods only, it is presumed that applicant's software incorporates all types of statistical computing software, as well as computer software for developing all types of software applications.  Likewise, the software "training" and "design and development" services, as currently recited in their respective applications, are broad enough to include training, design, and development for all types of software, including the software described in opposer's registration.

By way of applicant's Section 18 defense and proposed restrictions to the descriptions of goods and services, applicant's software and related services are limited to the field of "advanced" statistical software, using the "R" computer software programming language, and data from "two dimensional datasets."  See proposed (amended) descriptions

11

above. "R" is defined as "an open source programming language and software environment for statistical computing and graphics," and "an environment within which statistical techniques are implemented."[10] By itself, R "includes very barebones tools"[11] for the analysis and visualization of data,[12] not the storage and maintenance of data. The reference to a "two dimensional dataset" is meant to describe data presented in a way similar to a spreadsheet, with "a set of variables and then a set of observations of those variables."[13] As to applicant's use of the word "advanced," this is meant to "make clear what … is widely understood," namely, that, in the software industry, "statistical computing" involves "more sophisticated and advanced analysis" along the lines of "regression and multiple regression, analysis of variance time series forecasting, and other sophisticated analytical tools."[14]

Applicant's Section 18 defense and the import of the proposed restrictions to its field of software and related services are supported by the record. That is, applicant's

---

[10] Opposer's Notice of Reliance, Exhibit H (R-Project, *What is R?*, http://www.r-project.org/about.html).
[11] Allaire Discov. Dep. 27:10-11.
[12] Opposer's Notice of Reliance, Exhibit H (R-Project, What is R?, http://www.r-project.org/about.html).
[13] Allaire Discov. Dep. 126:20-23.
[14] Allaire Dep. 204:7-23. Applicant notes that the wording "advanced statistical analysis" in the amended identification "is simply making explicit what is implicit in statistical computing." *Id*. at 205:17-19.

CEO, Mr. Allaire, describes the function of applicant's RSTUDIO software as designed to act as a set of integrated tools that make it "easier" and "more productive" to work with the R computing language.[15] Because R is an open source environment within which statistical techniques are implemented, it can be easily extended via packages. It is estimated that there are hundreds of packages that have been created to do specialized tasks.[16] By way of example, applicant posits that a "user of RSTUDIO software might take a two dimensional dataset with several points of data related to patients with diabetes, such as gender, ethnicity, average weight, average glucose reading, etc., and load this dataset into RSTUDIO in order to perform statistical calculations on the data." Brief, p. 9, citing to Allaire Dep. 197:9-201:9. Ultimately, the function of applicant's software is limited to that of computer software for statistical computing using the R computing language and the data from two dimensional datasets.

Although the opposed applications are based on an intent to use, there is evidence that applicant's software is available for download from its website.[17] Applicant also offers a "hosted" version of its software that can be

---

[15] *Id*. at 206:24-207:02-07.
[16] http://www.r-project.org/about.html, Opposer's Notice of Reliance, Exhibit H.
[17] Allaire Dep. at 180:18-181:7.

accessed using a web browser.[18]  Both the downloadable and hosted versions of the software are currently in "beta testing," meaning applicant has not yet released a final version of the software.[19]  Applicant states that consumers currently do not pay for the software.[20]  Applicant also states, "We don't know what the pricing's going to be [for the software] yet."[21]

The relevant consumers of applicant's software are "R programmers" who "use the R programming language to do statistical computing."[22]  Applicant has indicated that "almost all" of the early adopters of its software have been educational institutions.[23]  These consumers "are solving complex problems using a complex tool"[24] by "mak[ing] a pretty careful evaluation about what tools they use" and are considered "highly sophisticated."[25]

Regarding applicant's services, the proposed identification restrictions limit the services to the field of software for advanced statistical computing using the R computing language and the data from two dimensional datasets.  In particular and with respect to applicant's

---

[18] *Id.* at 182:22-183:3.
[19] *Id.* at 182:5-9.
[20] *Id.* at 184:16-17.
[21] Allaire Discov. Dep. 34:6-7.
[22] Allaire Dep. 184:1-3.
[23] Allaire Discov. Dep. 34:8-11.
[24] Allaire Dep. 184:23-24.
[25] *Id.* at 185:13-23.

training services in International Class 41, applicant intends to train others in the use of the R computing language and RSTUDIO.[26] Likewise, for applicant's services in International Class 42, applicant intends to provide access to or use of RSTUDIO over a computer network by way of a web browser,[27] provide guidance on how to conduct analyses of data and other questions regarding how users may conduct their work,[28] design and develop software within RSTUDIO to assist users in performing statistical analyses,[29] and provide assistance with troubleshooting technical problems with the RSTUDIO software.[30]

Again, while the applications are based on an intent to use, the evidence shows that applicant's services are presently rendered directly from applicant, "typically through an e-mail."[31] Though no actual prices have been set for these services, applicant has indicated that it intends to charge for these services.[32] And given that applicant's amended identifications relate specifically to its software product, it is presumed that the relevant consumer for applicant's software product is the same consumer of applicant's services.

---

[26] *Id.* at 155:1-2, 156:3-19.
[27] *Id.* at 158:21-23.
[28] *Id.* at 159:5-14.
[29] *Id.* at 160:5-6.
[30] *Id.* at 160:9-16.
[31] *Id.* at 187:2-6.

When it comes to the actual advertising of applicant's software and related services, applicant does not engage in any "explicit promotional activities"[33] but instead relies primarily on word-of-mouth promotion from its beta customers.[34]  In addition, applicant has visited some schools to promote its goods,[35] as well as a conference "dedicated to the use of R."[36]

B.  Opposer's Software

Opposer first developed a software product being sold under the mark ER/STUDIO in 1997.[37]  The pleaded registration for said mark issued in 1998 and covers "entity relationship modeling software for SQL databases."  The record reveals that "entity relationship modeling software for SQL databases" refers to software for developing a "relational database."[38]  A relational database is one that

---

[32] *Id*. at 186:21-23.
[33] Allaire Discov. Dep. 62:11-12.
[34] *Id*. at 62:12-16.  *See also* Allaire Dep. 184:4-9 ("Typically [customers] would hear from maybe a colleague or a friend that, hey, there's a tool out there that makes it easier to work with R, and so then they would come to the website, maybe look at some of the screen shots, satisfy themselves that it's worth their time to download it, and then download it.").
[35] Allaire Discov. Dep. 62-63:17-6.
[36] *Id*. at 66-67:17-8.
[37] Tiret Dep. 131:01, 172:12-14.  Prior to this date, Mr. Tiret testified the product was called ER/1. *Id*. at 172:6-10; *see also* Tiret Discov. Dep. 27:4.  The product released as ER/STUDIO would eventually become known as ER/Studio Data Architect.  Tiret. Dep. 173:9-12.
[38] Tiret Discov. Dep. 18:18-23, 26:19-27:16.  Opposer also notes in its explanation of its exhibits in its Rebuttal Notice of Reliance that Exhibit E (excerpts from the manual *R Data Import/Export*) consists of a manual that "shows how the R

stores data in multiple tables, with the tables usually having a common field that allows the data to be categorized by a particular event.[39] In such a database, the data relationship is presented visually.[40] This is distinguished from a "two dimensional dataset," which typically consists of one table with different values, usually in the forms of columns and rows.[41] Accordingly, the relational database allows for more factors to be considered than would be found in a two dimensional database.

In addition to the software product identified in the registration, opposer has used ER/STUDIO, either by itself or combined with other wording, on the following complementary software goods, which opposer refers to generally as "design and architecture tools":[42]

---

language is well adapted to work with relational databases, such as ER/Studio."

[39] Tiret Discov. Dep. 17:7-19:13. We also take judicial notice of the definition of "relational database" from The American Heritage® Dictionary of the English Language (4th ed. 2000): "A database system in which any database file can be a component of more than one of the database's tables." The Board may take judicial notice of definitions obtained from dictionaries that (1) are available in a printed format, (2) are the electronic equivalent of a print reference work, or (3) have regular fixed editions. TBMP §704.12; *see* Fed. R. Evid. 201; 37 C.F.R. §2.122(a).

[40] Tiret Discov. Dep. 17:21-19:13, 26:19-27:16.

[41] *See* Allaire Dep. 126:20-127:3; Allaire Discov. Dep. 40:17-21-27.

[42] Tiret Dep. 112:24.

17

- ER/Studio Data Architect (data modeling tools for designing and understanding databases);[43]

- ER/Studio Business Architect (process modeling, or the exercise of mapping out a business process,[44] and conceptual modeling, or "a way to map out the technical infrastructure of an organization"[45]);[46]

- ER/Studio Software Architect (application development);[47]

- ER/Studio Repository (stores database development models);[48]

- ER/Studio Portal (searches and reports from a browser metadata stored in ER/Studio Repository);[49]

- ER/Studio Metawizard (takes metadata from the logical or physical design and exports it to another format;[50] it "helps translate the model to another format");[51]

- ER/Studio Viewer (a read-only product that allows users to see, navigate, and print databases);[52]

---

[43] *See id*. at 115:21-22, 118:12-17, Exhibit 5; *see also* Tiret Discov. Dep. 14:12-19:13.
[44] Tiret Discov. Dep. 12:16-19.
[45] *Id*. at 12-13:22-1.
[46] *See* Tiret Dep. 115:15-17, 120:8-14-21, Exhibit 5; *see also* Tiret Discov. Dep. 19:17-21:14
[47] *See* Tiret Dep. 118:18-120:6-20; *see also* Tiret Discov. Dep. 21:18-22:25
[48] *See* Tiret Dep. 121:3-25; *see also* Tiret Discov. Dep. 23:13-22.
[49] *See* Tiret Dep. 121:25-123:3-22, Exhibit 5; *see also* Tiret Discov. Dep. 23:13-18.
[50] Tiret Discov. Dep. 23:25-25:10
[51] *Id*. at 24:6-7.
[52] *Id*. at 25:19-26:1.

- ER/Studio Developer Edition (allows users to create databases and also create software that will interact with the databases);[53]

- ER/Studio Enterprise (bundles ER/Studio Business Architect, ER/Studio Data Architect, ER/Studio Software Architect, ER/Studio Repository, and ER/Studio Portal);[54]

- ER/Studio XE (same as ER/Studio Enterprise, but adds ER/Studio Metawizard to the bundle of software provided);[55] and

- ER/Studio Standard ("Provides complete environment for analyzing, designing, creating, and maintaining database applications").[56]

Opposer's aforementioned software products (or database "design and architectural tools") are described by Mr. Tiret as for "anybody that needs a database, that needs to design or develop a database," as well as those that need to "design and develop the application code that would sit on top of the database."[57]  The software products are offered to consumers in a variety of ways, such as direct sales representatives, telephone sales, third-party resellers, and

---

[53] *Id*. at 26:5-13.
[54] Tiret Dep. 118:5-10.
[55] *Id*. at 115:13-15, 118:6-7.
[56] *Id*. at Exhibit 9.
[57] *Id*. 116:15-20.

opposer's own e-commerce website.[58]  Opposer does not,
however, offer these goods in any retail settings where
consumers could walk in off the street and purchase the
goods off the shelf.[59]  The products are marketed on trade
sites and in trade magazines,[60] as well as at an annual
trade show.[61]  Opposer estimates that it spends $500,000 per
year on its various marketing activities.[62]  Consumers of
opposer's goods include "self-employed consultants" building
databases for others and "some academic type of licenses
sold to schools,"[63] but opposer notes that its goods are for
"general application use" and are not sold to any specific
industry.[64]  Within larger organizations, opposer has
identified "data modelers," "data analysts," "data
architects," "database developers," "database architects,"
"application developers," "application architects,"
"business analysts," "database administrators," "software
engineers," and "software developers" as potential end users
of the products offered under the ER/STUDIO mark.

The sales cycle for the ER/STUDIO goods ranges
"anywhere from a day to a year,"[65] though opposer

---

[58] Tiret Discov. Dep. 45:11-20.
[59] *Id*. at 49:18-25.
[60] *Id*. at 49:15-17.
[61] *Id*. at 54:21-24.
[62] Tiret Dep. 132:12-14.
[63] Tiret Discov. Dep. 50:19-24.
[64] Tiret Dep. 116:14-25.
[65] Tiret Discov. Dep. 48:8.

acknowledges that the one-day sales are "kind of rare."[66]

The prices for opposer's goods range from $500 for ER/STUDIO

VIEWER to $5,995 for ER/STUDIO XE,[67] and purchasers must

also pay additional "required maintenance" fees ranging from

$180 to $1,499 at the time of purchase of opposer's

software.[68]

## Standing

Opposer has established its standing in this proceeding

through its pleaded registration, which applicant has

admitted opposer is the owner of and furthermore was made of

record by opposer by attaching printouts from the Office

electronic database with the Notice of Opposition showing

current status and title thereof.  Trademark Rule

2.122(d)(1).  See also *Cunningham v. Laser Golf Corp.*, 222

F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *Lipton*

*Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213

USPQ 185 (CCPA 1982).

## Priority

Because opposer's pleaded registration is of record,

Section 2(d) priority is not an issue in this case as to the

specific goods covered by said registration vis-à-vis

applicant's marks and goods and services.  *King Candy Co. v.*

---

[66] *Id*. at 48:22.
[67] *Id*. at 62:21-64:13; *see also* Applicant's Notice of Reliance,
Exhibit H.
[68] Applicant's Notice of Reliance, Exhibit H.

*Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

In addition, opposer has pleaded and attempts to rely on common law rights in ER/STUDIO, as well as the other aforementioned ER/STUDIO-formative marks, used on or in connection with software products that complement opposer's mainstay data modeling software tools for designing and understanding databases. Opposer has also pleaded and attempts to rely upon common law rights in the ER/STUDIO mark in connection with consulting services.

In contrast to its rights acquired via its pleaded and uncontested registration, and to the extent opposer wishes to rely on its common law rights, it must establish priority with respect to such rights. That is, opposer must prove by a preponderance of the evidence that its common law rights were acquired before any date upon which applicant may rely. Trademark Act Section 2, 15 U.S.C. §1052; *Hydro-Dynamics Inc. v. George Putnam & Company Inc.*, 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987) (The "decision as to priority is made in accordance with the preponderance of the evidence"). For priority purposes, applicant, at the very least, can rely on the filing date of its trademark applications, March 16, 2009. *Zirco Corp. v. American Telephone and Telegraph Co.*, 21 USPQ2d 1542, 1544 (TTAB 1991) ("[T]here can be no doubt but that the right to rely

22

upon the constructive use date comes into existence with the filing of the intent-to-use application and that an intent-to-use applicant can rely upon this date in an opposition brought by a third party asserting common law rights.").

Mr. Tiret, opposer's Director of Modeling and Design Solutions in the Product Management Department, testified that opposer began using the mark ER/STUDIO in 1997 in connection with database design and construction,[69] and the evidence attached to that testimony (consisting of archived web pages from opposer's website) supports this assertion.[70] The record also shows that opposer began using the mark ER/STUDIO in connection with other terms on related products that provide additional functions or extend the capability of opposer's flagship database and design software, as described in the pleaded registration. Specifically, opposer has used the mark ER/STUDIO REPOSITORY since at least 2002,[71] and the marks ER/STUDIO STANDARD, ER/STUDIO ENTERPRISE,[72] and ER/STUDIO VIEWER since at least 2008.[73] In addition, the record establishes that opposer also began

---

[69] Tiret Dep. 131:01, 172:12-14.
[70] *Id.* at Exhibit 9.
[71] *Id.* at 134:18-24, Exhibits 6, 9.
[72] In contrast to how these goods were described in the "Opposer's Software" portion of the "Background Discussion" section of this opinion, this software is described in Exhibit 9 of the Tiret Deposition as follows: "Includes the server-side ER/Studio Repository for improved teamwork and enterprise collaboration and Embarcadero's business process and conceptual modeling tool, EA/Studio."
[73] Tiret Dep., Exhibit 9.

using the marks ER/STUDIO XE, ER/STUDIO DATA ARCHITECT, and ER/STUDIO BUSINESS ARCHITECT at least as early as 2008.[74] Accordingly, we find that opposer has established prior common law rights in the aforementioned marks on software products that generally supplement features or functions of opposer's entity relationship modeling software for SQL databases by allowing for the storing of models, the viewing of databases, and process and conceptual modeling.[75]

With respect to any common law rights for services, it has not been shown that opposer has used the mark ER/STUDIO (alone or in combination with other wording) in connection with any software-related services prior to March 16, 2009.

In view of the above, our likelihood of confusion analysis is limited to opposer's ER/STUDIO registration and the goods identified therein, as well as opposer's prior common law rights in ER/STUDIO-formative marks and the

---

[74] Applicant's Notice of Reliance, Exhibit H.

[75] For a specific breakdown of which software performs what function, see discussion thereof, *supra*, pp. 17-19 ("Opposer's Software").

Mr. Tiret's testimony, and related exhibits, includes references to other trademarks and software products; however, it has not been shown by the preponderance of the evidence, that opposer has prior common law rights in such marks. For example, one of opposer's exhibits attached to Mr. Tiret's testimony (Exhibit 6) includes references to certain other goods sold under the ER/Studio Software Architect mark, but there is no indication that use of such mark on the goods began prior to March 16, 2009. While certain exhibits display copyright dates of "2009," this does not establish that the marks identified in the documents were actually in use prior to applicant's filing date such that prior common law rights may be claimed.

respective goods on which they are used, vis-à-vis applicant's RSTUDIO mark and the goods and services identified in the applications.

## Likelihood of Confusion

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also In re Majestic Distilling Co., Inc.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). However, not all the factors are necessarily relevant or of equal weight, and any one of the factors may control in a given case, depending upon the evidence of record. *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1260 (Fed. Cir. 2011); *In re Majestic Distilling Co.*, 315 F.3d at 1315, 65 USPQ2d at 1204; *see In re E. I. du Pont de Nemours & Co.*, 177 USPQ at 567.

A. <u>The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.</u>

We initially address the *du Pont* factor involving the similarity or dissimilarity of the marks when viewed in their entireties in terms of appearance, sound, connotation and commercial impression. *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d

25

1369, 73 USPQ2d 1689 (Fed. Cir. 2005); *see also In re E. I. du Pont De Nemours & Co.*, 177 USPQ at 567.

Although opposer has demonstrated prior common law rights in several ER/STUDIO-formative marks, we make a comparison only between opposer's ER/STUDIO mark and applicant's RSTUDIO mark because it is the most similar mark, and therefore the one on which opposer is most likely to prevail. That is, in examining the similarity, the other ER/STUDIO-formative marks are clearly further removed inasmuch as they possess additional terms not found in applicant's mark. If the opposition is to be sustained based on opposer's ER/STUDIO mark, then we need not consider the other marks. If the opposition cannot be sustained on the ER/STUDIO mark, it will not be sustained based on other marks which are more distinguishable from applicant's mark.

In comparing the RSTUDIO and ER/STUDIO marks, the obvious points of similarity are that they are prefaced with the letters "ER" or "R" and share the element "STUDIO." Furthermore, while "there is no correct pronunciation of a trademark," *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1912 (Fed. Cir. 2012); *In re Belgrade Shoe Co.*, 411 F.2d 1352, 162 USPQ 227 (CCPA 1969), we find that the two marks are likely to be verbalized in a similar manner by at least a significant number of consumers. *Cf. Interlego AG v. Abrams/Gentile Entertainment Inc.*, 63 USPQ2d 1862 (TTAB

26

2002) (finding that LEGO and MEGO would be pronounced similarly). On the other hand, because opposer's mark begins with the letter E, there is a noticeable visual difference in the marks as well as a reason to pronounce the marks differently.

Our analysis concerning the similarity of the marks, however, does not end with their appearance and sound. Rather, we must also look at any commercial impressions or connotations created by the marks and, in doing so, we consider the marks in relation to the identified goods and services. *See e.g.*, *Coach Services, Inc. v. Triumph Learning LLC,* 96 USPQ2d 1600 (TTAB 2010), *aff'd,* 101 USPQ2d 1713 (Fed. Cir. 2012) (COACH for educational software does not dilute or create likelihood of confusion with COACH for handbags, luggage, etc.); *In re Sears, Roebuck & Co.*, 2 USPQ2d 1312 (TTAB 1987) (CROSSOVER for brassieres creates a different commercial impression from CROSSOVER for ladies' sportswear); *In re British Bulldog, Ltd.*, 224 USPQ 854 (TTAB 1984) (PLAYERS for shoes engenders a different commercial impression from PLAYERS for underwear); *see also In re Oppedahl & Larson LLP*, 373 F.3d 1171, 71 USPQ2d 1370, 1373 (Fed. Cir. 2004) ("The Board must, of course, determine the commercial impression of a mark in the proper context of the goods or services associated with that mark.") (citation omitted).

In this case, the parties' marks engender different commercial impressions when considered in the context of applicant's described goods and services, as amended, and opposer's goods.  That is, each of the letter prefixes employed in the marks, "R" and "ER", has a uniquely different and specific meaning as applied to the respective types of software being sold under each mark.  First, with respect to opposer's mark, consumers of opposer's entity relationship modeling software will understand the letters "ER" as a recognized abbreviation for "entity relationship." The record includes printouts from approximately fifty (50) different websites showing the acronym "ER" as an abbreviation or in a substantially synonymous manner as the term "entity relationship" in connection with databases.[76] The following are representative excerpts from these websites:

> http://databases.about.com/cs/specificproducts/g/er.htm: "An entity-relationship (ER) diagram is a specialized graphic that illustrates the interrelationships between entities in a database."

> http://searchsqlserver.techtarget.com/definition/entity-relationship-model: "The entity-relationship model (or ER model) is a way of graphically representing the logical relationships of entities (or objects) in order to create a database."

> http://www.pcmag.com/encyclopedia_term/0,2542,t=entity+relationship+model&i=42662,00.asp: "Definition of: entity relationship model.  A database model that describes the attributes of entities and the

---

[76] Applicant's Notice of Reliance, Exhibit F.

relationships among them.  An entity is a file (table).  Today, ER models are often created graphically, and software converts the graphical representations of SQL code required to create the data structures in the database."

http://www.utexas.edu/its/archive/windows/database/datamodeling/index.html: "This document is an informal introduction to data modeling using the Entity-Relationship (ER) approach."

http://www.aquafold.com/er-modeler.html: "Aqua Data Studio offers an Entity Relationship (ER) Modeler for all major RDBMSes."

Moreover, opposer has acknowledged that most of the users of its products, or database modeling software in general, would understand "ER" to mean "entity relationship."[77]

Applicant's mark, on the other hand, is prefaced with the letter "R" and, as previously discussed, R is the name of the software programming language that provides the subject matter and field of use for applicant's RSTUDIO software and related services, as amended.  Thus, the "R" element of applicant's mark clearly identifies the nature of applicant's advanced statistical computing software using the R computing language as well as the training and consulting services involving the R programming language. Consumers of the described goods and services will immediately understand the descriptive significance of R, as

---

[77] Tiret Discov. Dep. 95:8-24.

used in applicant's mark in connection with the goods and services.

As to the latter, common element, STUDIO, the record establishes convincingly that this term is used frequently by third parties in the names of various types of software products.  There are fifty (50) different websites using the word "studio" in connection with or on software goods.[78] The following are representative examples:

> http://www.aquafold.com ("Aqua Data Studio" for database software);
>
> http://datafeedstudio.com ("Datafeed Studio" for database development software);
>
> http://www-01.ibm.com/software/data/optim/data-studio ("IBM Data Studio" for database development and management software);
>
> http://www.support.sas.com/rnd/app/studio.html ("SAS/IML Studio" for statistical programming software);
>
> http://www.sqlstudio.com ("SQL Studio Data Compare" for database comparison and development software)
>
> http://www.sqlmanager.net/products/studio/oracle ("EMS SQL Management Studio 2010 for Oracle" for database administration and development software)

In addition, opposer has acknowledged that STUDIO is "sometimes used in the software industry to suggest a collection of tools or programs in a way somewhat analogous to what one may find in an artist's 'Studio' or a music

---

[78] Applicant's Notice of Reliance, Exhibit E.

'Studio'."[79]  Opposer's witness, Mr. Tiret, characterized "studio" as "a general term" used in connection with software.[80]

Based on the record, we find that the common term, STUDIO, is highly suggestive and commonly adopted by third parties in connection with software.  It thus lacks any significant degree of distinctiveness so as to warrant anything more than a narrow scope of protection.  *See Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066, 1075-77 (TTAB 2011); *Knight Textile Corp. v. Jones Investment Co.*, 75 USPQ2d 1313, 1315-17 (TTAB 2005).  Our primary reviewing court has long held that highly suggestive common elements are not accorded great weight in the likelihood of confusion calculus.  *See, e.g., Pioneer Hi-Bred Corn Co. v. Welp*, 280 F.2d 151, 126 USPQ 398 (CCPA 1960) ("The record shows that both parties deal in hybrid poultry, and 'Hy' therefore has a suggestive significance, hence is not entitled to as great weight in determining likelihood of confusion as an arbitrary word or syllable."); *Lauritzen & Co. v. The Borden Co.*, 239 F.2d 405, 112 USPQ 60, 62 (CCPA 1956) ("In the instant case, the syllable 'lac,' which is common to the two trademarks under consideration, has a somewhat descriptive connotation as applied to milk products, and has been

---

[79] *Id*. at Exhibit B, at p. 11 (opposer's response to applicant's interrogatories).

commonly used as a portion of trademarks for such products. Accordingly, it should be given little weight in determining whether those marks are confusingly similar."); *see also Packard Press, Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 56 USPQ2d 1351 (Fed. Cir. 2000) ("it is proper to give greater weight to the PACKARD portion of the PACKARD TECHNOLOGIES mark on the ground that the word "technology" is highly suggestive/merely descriptive with respect to the services at issue"); and *Land-O-Nod Co. v. Paulison*, 220 USPQ 61 (TTAB 1983) (CHIROPRACTIC and CHIRO-MATIC).

Accordingly, we find a degree of similarity in the marks' appearance and sound; however, each mark possesses a separate and distinctively different commercial impression and connotation. The common element STUDIO is highly suggestive and weak and commonly adopted in the field of software. Consumers, viewing the marks in their entireties, will therefore focus on the initial letters, R and ER, and when viewing these marks on or in connection with the respective types of software and services, they will be able to distinguish the marks.[81] Accordingly, this *du Pont*

---

[80] Tiret Discov. Dep. 97:13-14.

[81] For sake of clarity, we do not find that the letter "R" will necessarily have the same distinctive connotation when considered in the context of applicant's broadly-worded, unamended goods and services. Without the Section 18 defense proposed amendments to applicant's goods and services, it stands to reason that the letter "R" would be less likely understood as a reference to the statistical software computing language.

factor weighs in favor of not finding a likelihood of confusion, despite the aural and visual similarity of the marks.

B. The similarity or dissimilarity and nature of the parties' goods and services

We now turn to a consideration of the relatedness of the goods and services at issue in this case. As previously discussed, our likelihood of confusion determination is confined to the identifications of goods and services set forth in the opposed applications and the goods in the pleaded registration, as well as those goods on which opposer has established prior common law use.

In comparing the parties' goods and services, we consider whether "the respective products are related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they emanate from the same source." *Coach Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (citing *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)). On the other hand, and with particular relevance to this proceeding, given that computer software is employed in nearly all industries and facets of life, the fact that both parties' goods are computer software is not sufficient, in and of itself, to establish a relationship between the goods. *See, e.g.*, *M2 Software, Inc. v. M2 Communications, Inc.*, 450 F.3d

33

1378, 78 USPQ2d 1944, 1948 (Fed. Cir. 2006) ("Moreover, given the pervasiveness of software and software-related goods in society, it would be inappropriate to presume relatedness on the mere basis of goods being delivered in the same media format, especially where, as here, the goods described in both the application and registration are defined narrowly, along distinct industry lines."); *Electronic Data Systems Corp. v. EDSA Micro Corp.*, 23 USPQ2d 1460, 1463 (TTAB 1992) ("All computer software programs process data, but it does not necessarily follow that all computer programs are related. Given the ubiquitous use of computers in all aspects of business in the United States today, this Board and its reviewing Court have rejected the view that a relationship exists between goods and services simply because each involves the use of computers.").

With the above in mind, we first address applicant's described goods and services, as published for opposition and without regard to the proposed amended identifications, vis-à-vis opposer's goods, and readily find them to be related. Applicant's "computer software for software applications development" is broad enough to include database software applications and, in which case, would clearly be related to opposer's database modeling software. The unamended descriptions of services are even more broadly termed and encompass training and consulting services in the

particular field of opposer's database modeling software. Accordingly, we find applicant's described goods and services, without amendments thereto, are related to opposer's software.

This brings us to a second, separate analysis under Section 2(d), involving applicant's goods and services, as described in the amended descriptions, vis-à-vis opposer's goods. Again, by way of the amendments, the International Class 9 goods are identified as, "computer software for advanced statistical computing using the R computing language and the data from two dimensional datasets." Similarly, applicant has restricted its training, consulting and application service provider (ASP) services in International Classes 41 and 42 to the field of software using the R computing language and data from two dimensional datasets.

Applicant's proposed amendments to its descriptions of goods and services are significant; they narrow applicant's software goods and related services to a particular field of use that is unrelated to opposer's software. Applicant's software cannot function unless the R computing language is part of a user's system.[82] Applicant's software also cannot be used to construct or maintain a relational database[83] and

---

[82] Allaire Dep. 124:16-125:3.
[83] *Id*. at 134:3-5.

35

does not have the inherent ability to interface or interact directly with relational databases.[84] Ultimately, applicant provides software for advanced statistical analysis of external two-dimensional data.[85]

Opposer points to the fact that its software performs statistical analysis. However, the nature of the analysis is quite different from that performed by applicant's software. Opposer's software is quite removed from the R computing language and has no native ability to perform statistical analysis of external data in the databases ultimately created by users of its software.[86] Rather, any statistical analyses performed by opposer's software is confined to "metadata," which is defined as, "details of the information contained in a large computer database, for example who wrote the information and what format it is in."[87] Thus, it appears that the statistical functions performed by opposer's software are merely ancillary to the main function of the software, which is database design and development. We consider opposer's software statistical feature as being akin to word processing software that also provides statistical analysis in the form of providing the

---

[84] *Id*. at 131:21-132:05.
[85] *Id*. at 128:6-11.
[86] Tiret Dep. 174:6-9.
[87] We take judicial notice of the dictionary definition of "metadata" from Macmillan Dictionary (2012), *available at*

number of pages, words, paragraphs, lines, and characters in a written document through a "word count" or similar feature. The fact that word processing software may provide a statistical analysis in such a manner does not make it software <u>for</u> statistical analysis, and consumers would not purchase it to perform statistical analysis. Another example is video game software, which may provide statistics such as number of games played, high scores, and win/loss ratios. Again, however, the fact that video game software may offer certain game statistics does not mean that consumers would consider it software <u>for</u> statistical analysis. In sum, it remains that opposer's software products, even in expanded form and including all features for which it has shown prior common law use, cannot be considered software for statistical analysis or otherwise sufficiently related to applicant's software.

Opposer argues that various third-party "plug-ins" and "bridge" software are available that may make applicant's software compatible with opposer's software. We have considered this argument and the evidence in support thereof. However, this does not persuade us that the parties' respective software products are related. Although a consumer may conceivably use opposer's software to develop

---

http://www.macmillandictionary.com/dictionary/american/metadata. *See* n. 39, *supra*.

37

a database and then, with the assistance of third-party plug-in software, applicant's software may be used later to analyze the data that populates the database, this does not necessarily translate into the parties' software products being related.  The functions of the software products remain very different and would be so viewed by the respective users.  That is, even if RSTUDIO users could use third-party plug-in software so that they could access data from an ER/STUDIO-developed (or other entity relationship) database, the fact remains that statistical computing software is very different from design tool software used for designing and maintaining relational databases. *In re Shell Oil Co.,* 992 F.2d 1204, 26 USPQ2d 1687, 1692 (Fed. Cir. 1993); *Edwards Lifesciences Corp. v. VigiLanz Corp.,* 94 USPQ2d 1399 (TTAB 2010) (we are not concerned with mere "theoretical possibilities" of likelihood of confusion).

We have also considered opposer's argument that relevant purchasers would think the different products related due to opposer's broad suite of software products: "a customer can use ER/STUDIO to design a database or software and then go in to build applications on top of the database or software using [opposer's software tools]." Brief, p. 40.  In this regard, although we have found the evidence lacking with regard to establishing priority as to opposer's common law rights in ER/Studio Software Architect,

we nevertheless consider the evidence probative to the extent that it shows related software products and portrays a possible natural scope for expansion. After careful consideration of all the software products for which opposer has established prior common law rights in the mark ER/STUDIO, we do not find that they, individually or as a group, are sufficiently related to applicant's goods or services; nor does their existence establish a relationship between opposer's entity relationship modeling software for SQL databases and applicant's goods and services, or otherwise bring them closer. Rather, opposer's software products being sold under the ER/STUDIO or ER/STUDIO-formative marks, as described above, are very much integrated with opposer's database modeling software identified in the pleaded registration. Opposer's software products, for which it has established prior common law rights, do not appear to have any connection to applicant's advanced statistical software using the R computing language and the data from two dimensional datasets, and we do not find them to be significantly related.

In conclusion, we find applicant's software and related services, identified in their broader form in the applications as published, to be related to opposer's software. In contrast, taking applicant's proposed amendments into account, we do not find any significant

39

relationship between the respective software products of the parties other than falling under the very broad product category of "software." Applicant's services are even one step further removed inasmuch as they involve a service, *e.g.*, consulting, training, technical support, *etc.*, in the field of the R computing language software.

C. <u>Trade channels, classes of purchasers, and conditions under which and buyers to whom sales are made, i.e., "impulse" vs. careful, sophisticated purchasing.</u>

The parties have presented contrasting arguments on the *du Pont* factors involving relatedness of trade channels and classes of purchasers, as well as the conditions under which the parties' software products and services are sold. Ultimately, and for reasons explained further below, these factors either remain neutral in our likelihood of confusion analysis or weigh in favor of finding no likelihood of confusion.

As to the classes of purchasers, the parties have correctly noted that the applications and pleaded registration do not contain any limitations in their descriptions of the goods and services. We must therefore presume that they travel in the normal trade channels and are offered to the usual classes of purchasers for the respective goods and services. *Citigroup Inc.*, 637 F.3d 1356, 98 USPQ2d 1261; *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002).

40

However, because opposer's goods are not the same as applicant's goods and services, as identified in its amended descriptions, we cannot presume these trade channels and classes of purchasers to necessarily be the same. The record does not establish that the normal trade channels or classes of purchasers for opposer's entity relationship modeling software for SQL databases match the trade channels and classes of purchasers for applicant's software goods and services. Instead, the record as a whole suggests that the R computational language is used mostly by statisticians while ER/STUDIO is mostly used by information architects and database administrators responsible for the design, storing and maintenance of large databases. That is not to say that there is no possibility of any overlap between the two classes of consumers. However, as seen under the fourth *du Pont* factor, any overlap between the two will involve sophisticated users in both professions.

Indeed, the nature of the parties' respective software products makes any potential confusion unlikely. The record shows that consumers of both opposer's and applicant's respective goods and services are likely to be very knowledgeable of the types of products and the purpose of what they are purchasing. Again, opposer's own witness testified that while it is possible for a sales cycle of opposer's software to be "one-day," this would be "kind of

rare" and typical sales cycles are more likely a question of "maybe weeks, months...." Moreover, the pricing point of opposer's software varies, and the fact that it is not found in retail stores leads us to conclude that opposer's products are not inexpensive and require considerable forethought prior to purchase. As to applicant's software, it has been shown that the software will be sought by consumers who are equally experienced in their specific field, namely, advanced statistical analysis, and they will be looking to use applicant's software for particular purposes which are rather different from the uses of opposer's software. In short, consumers of both parties' software are likely to be sophisticated and well-informed in seeking the respective and very different products and services of applicant and opposer.

The fact that the parties' goods are of a very technical and specialized nature, not the types of software to be purchased in retail stores, and the fact that they will be purchased by technology professionals highly familiar with the different nature, use and purpose of each software product, carry great weight and diminish any likelihood of confusion. *See Electronic Design & Sales Inc. v. Electronic Data Systems Corp*., 954 F.2d 713, 21 USPQ2d 1388, 1391 (Fed. Cir. 1992) ("sophistication is important and often dispositive because sophisticated consumers may be

42

expected to exercise greater care;" reversing the Board and finding no likelihood of confusion resulting from the contemporaneous use of E.D.S. and EDS despite the fact that "the two parties conduct business not only in the same fields but also with some of the same companies."). *See also* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:101 (4th ed. 2009) ("Where the relevant buyer class is composed solely of professional, or commercial purchasers, it is reasonable to set a higher standard of care than exists for consumers.").

Based on the record and the circumstances particular to this case, the factors involving purchasing conditions and sophistication of consumers weigh in favor of finding no likelihood of confusion.

E.   Balancing the factors – Applicant's Section 18 Defense

In balancing the likelihood of confusion factors based on the unamended goods and services in the involved applications, we find there would be a likelihood of confusion.  Accordingly, applicant's assertion of the Section 18 defense, alternatively raised in the event the Board finds a likelihood of confusion, is relevant.

Applicant has established its Section 18 defense.  With the amended descriptions of goods and services in place, and upon weighing all relevant *du Pont* factors, we find no likelihood of confusion.  Although the marks are similar in

43

sound and appearance, they possess different connotations and create quite different commercial impressions when viewed and understood in the context of the parties' respective goods and services. The shared element, STUDIO, is extensively used by third parties in connection with various kinds of software, and consumers are therefore less likely to attribute source-identifying significance in this highly suggestive term. Thus, the overall commercial impression of and connotation created by applicant's mark, RSTUDIO, is dominated by the prefix R and will be readily understood as a reference to the R programming language. By contrast, the ER prefix in opposer's mark informs consumers of the function or field of use for opposer's entity relationship (ER) software. The respective software products possess very different functions and purposes and it is unlikely they will be used in conjunction with one another in a meaningful manner whereby consumers would mistakenly believe they emanate from a common source. Significantly, it has also been shown that consumers of the respective goods and services possess a degree of sophistication. The respective consumers will seek out the software products with a higher level of forethought and knowledge in the distinctively different functions of the parties' software.

**Decision:** Applicant's motion to amend the involved applications is granted and the descriptions of goods and services are amended accordingly.

The opposition is dismissed and the involved applications, as amended, will be forwarded for issuance of notices of allowance.